[Cite as *State v. Myers*, 2026-Ohio-1303.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
GREENE COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | C.A. No. 2024-CA-58 |
| Appellant | : | |
| | : | Trial Court Case No. 1993 CR 0066 |
| v. | : | |
| | : | (Criminal Appeal from Common Pleas |
| DAVID LEE MYERS | : | Court) |
| | : | |
| Appellee | : | **FINAL JUDGMENT ENTRY &** |
| | : | **OPINION** |

. . . . . . . . . . .

Pursuant to the opinion of this court rendered on April 10, 2026, the judgment of the trial court is reversed in part and is affirmed in part. The judgment on the motion for leave to file a motion for new trial is affirmed. The judgments on the motion for new trial and the petition for postconviction relief are reversed. This matter is remanded to the trial court with instructions to enter judgments overruling the motion for new trial and denying the petition for postconviction relief.

Costs to be paid as follows: 50% by appellant and 50% by appellee.

Pursuant to Ohio App.R. 30(A), the clerk of the court of appeals shall immediately serve notice of this judgment upon all parties and make a note in the docket of the service. Additionally, pursuant to App.R. 27, the clerk of the court of appeals shall send a certified copy of this judgment, which constitutes a mandate, to the clerk of the trial court and note the service on the appellate docket.

For the court,

ROBERT G. HANSEMAN, JUDGE

TUCKER, J., and EPLEY, J., concur.

**OPINION**
GREENE C.A. No. 2024-CA-58

MEGAN A. HAMMOND, Attorney for Appellant
NATALIE OLMSTEAD, CHRISTOPHER A. LAROCCO, and MAXWELL H. KING, Attorneys for Appellee

HANSEMAN, J.

{¶ 1} In this death-penalty case, the State of Ohio appeals from judgments granting David Lee Myers' motion for leave to file a motion for new trial, his new trial motion, and his petition for postconviction relief. According to the State, the trial court erred or abused its discretion in several ways. Concerning the motion for leave to file a motion for new trial, the State contends the trial court erred in concluding that Myers was unavoidably prevented from discovering new DNA evidence, in holding the State to an unsupported standard of law, and by considering the merits of the motion for new trial before granting the motion for leave.

{¶ 2} Regarding the new trial motion, the State argues that the trial court abused its discretion by considering improper evidence that was not part of the grounds for a new trial. Finally, concerning the petition for postconviction relief, the State contends the trial court lacked jurisdiction to consider the matter and abused its discretion in granting the petition.

2

**{¶ 3}** After reviewing the record and for the reasons discussed below, we conclude that the trial court did not err in granting the motion for leave to file a motion for new trial. However, the court did abuse its discretion in granting a new trial because its decision was based on unsound reasoning and it failed to apply correct legal principles. The court also failed to follow statutory requirements with respect to the postconviction petition and therefore lacked jurisdiction over it. Accordingly, the judgment granting Myers leave to file the motion for new trial is affirmed. The judgments granting a new trial and granting the petition for postconviction relief, however, are reversed and remanded with instructions to enter judgments overruling the motion for new trial and denying the petition for postconviction relief.

## I. Facts and Course of Proceedings

**{¶ 4}** The early history of this case is described as follows in our decision on Myers' direct appeal, which was issued in February 1999:

> On the evening of August 3, 1988, Amanda Maher and Glenn Smith went to Five Points Tavern, in Xenia. Defendant, David Lee Myers, entered the bar and began playing pool with Smith and Lee Weimer, a bartender. During the course of the evening Glenn Smith had quite a bit to drink. Around 12:30-1:00 a.m. on August 4, 1988, Amanda Maher, Glenn Smith, and David Myers left Five Points Tavern in Smith's car and drove to another bar a short distance away, the Roundtable.

> When they arrived at the Roundtable, Amanda Maher went inside while Glenn Smith and David Lee Myers argued in the parking lot outside. When Smith and Myers entered the bar, Smith became rowdy and broke a glass, prompting the barmaid to call police.

3

At approximately 1:13 a.m. Xenia Police Officers Savage and Rinehart arrived at the Roundtable and arrested Glenn Smith for disorderly conduct. Police gave Smith's wallet to Amanda Maher to enable her to get home. David Myers told Glenn Smith and Officer Savage that he would make sure Amanda Maher got home. Officers Savage and Rinehart then transported Glenn Smith to the Greene County Jail. Officer Rinehart resumed his normal patrol duties at 1:23 a.m.

Amanda Maher and David Lee Myers searched both inside and outside the Roundtable bar for the keys to Glenn Smith's car, but couldn't find them. They then left together. Another patron, Charles Van Hoose, saw them walking across the parking lot in the direction of Home Avenue. At approximately 1:30-1:35 a.m., Officer Rinehart observed Amanda Maher and David Lee Myers walking down Home Avenue, near the intersection with South Detroit Street.

At 2:10 a.m., David Lee Myers was seen by Lee Weimer, the bartender at Five Points Tavern, and Brenda Osborne, one of the customers, getting into his car, which was parked across the street from Five Points Tavern. At approximately 2:15 a.m., Myers entered the Roundtable bar at last call and ordered a drink. Myers immediately went to the restroom, and upon his return sat down and began to talk with another customer, Don Hilderbran. When Hilderbran asked Myers if he "got any," Myers responded that he tried but "she" wasn't willing so he just dropped her off. Myers subsequently left the Roundtable and went to Hilderbran's house.

At around 3:00 a.m., Jennifer Berry and Julia Griffith were walking through an old railroad bed area near Railroad Street in Xenia when they

4

discovered Amanda Maher, lying on the tracks and gasping for air. The area is on a path that is a direct walking route between Five Points Tavern and the Roundtable bar. Berry and Griffith ran home and called police.

At approximately 3:40 a.m., Xenia police officers, including Officers Savage and Rinehart, arrived on the scene. They discovered Amanda Maher lying on her back with the right side of her face turned upward. She was naked but for a shirt that was pulled up around her neck. A railroad spike had been driven into Amanda Maher's head at the temple. She was gasping for air. Amanda Maher's injuries were so severe that Officer Savage didn't recognize her. Amanda Maher was just three hundred yards from where Officer Rinehart had seen her and David Lee Myers walking together. Amanda Maher died while being care flighted to Miami Valley Hospital.

Xenia Police quickly classified David Lee Myers as a suspect. When questioned, Myers told police that Amanda Maher was at the Roundtable bar looking for Glenn Smith's car keys when he last saw her. Myers' statement conflicted with the observations of Officer Rinehart, who had seen Amanda Maher and David Lee Myers walking together just three hundred yards from the murder scene. When police confronted Myers with Officer Rinehart's observation, Myers had no response. Police then arrested David Lee Myers and charged him with the murder of Amanda Maher.

An autopsy revealed that Amanda Maher had been strangled. Three rocks had been pushed into her vaginal cavity. She had a laceration to her forehead consistent with an attempt to drive the railroad spike into her skull at

5

that location. Cause of death was severe head trauma from the railroad spike that was driven through her head at the right temple.

A taping of Amanda Maher's pubic area produced a foreign pubic hair. Forensic testing, including microscopic and DNA analysis, indicated that Glenn Smith and two other potential suspects, Gregg Grimes and Terry Rogers, could not have been the donor of that hair. The foreign pubic hair was microscopically similar in all respects to David Myers' known pubic hair standard. Further, Myers was included within the two percent of the Caucasian population that could have been the donor of that hair. When police conducted a search of Myers' car, they discovered the wallets of Amanda Maher and Glenn Smith underneath the front seat, concealed inside a glove.

After he was jailed on this murder charge Myers spoke with another inmate, Clarence David Tincher. While the two men were discussing their past sexual exploits, Myers stated that they couldn't get him on a rape. Myers then asked Tincher if he ever put three rocks up a girl. When Tincher replied no, Myers stated that he had done that. A few days later when Tincher asked Myers "why" a railroad spike, Myers responded, "because it was handy." Myers then told Tincher never to try and drive anything through a person's forehead because it won't go, but it will go through the temple. When Myers made these statements to Tincher the details of this crime, including the rocks that were in the victim's vagina, the forehead wound, and the temple location of the railroad spike through her head, had not yet been made public by Xenia police.

On August 8, 1988, David Lee Myers was indicted on one count of Aggravated Murder, R.C. 2903.01(B), with a death penalty specification that

6

the offense had been committed while Myers was committing aggravated robbery, and that Myers was the principal offender in the aggravated murder. R.C. 2929.04(A)(7). The case number assigned to this cause was 88-CR-251. Following years of extensive pretrial litigation, the State dismissed this case via a nolle prosequi on February 1, 1991.

Two years later, on February 4, 1993, David Lee Myers was reindicted in case number 93-CR-66 on this same charge, with the same death penalty specification. Once again there was extensive pretrial litigation. A jury trial commenced on January 2, 1996. Myers' defense at trial was that the evidence was insufficient to prove that he was Amanda Maher's killer. According to Myers' theory of the case, two other persons, Gregg Grimes and Terry Rogers, were likely perpetrators of the crime.

On February 8, 1996, the jury found David Lee Myers guilty as charged. The penalty phase of the proceedings began on February 20, 1996, following which the jury concluded that the aggravating circumstance outweighed the mitigating factors beyond a reasonable doubt. Accordingly, on February 23, 1996, the jury recommended that David Lee Myers be sentenced to death. The trial court, after conducting its own independent review, reached the same conclusion. Thus, on March 1, 1996, the trial court sentenced David Lee Myers to death for the aggravated murder of Amanda Maher. The trial court also imposed a sentence of ten to twenty-five years imprisonment for aggravated robbery. On March 14, 1996, the trial court filed an amended sentencing entry deleting the sentence for aggravated robbery.

State v. Myers, 1999 WL 94917, *1-3 (2d Dist. Feb. 12, 1999) ("Myers I").

7

{¶ 5} In the direct appeal, Myers asserted twenty assignments of error, all of which we overruled. In one instance, we did find error in the trial court's admission of "other acts" testimony from a prior alleged rape victim but found it harmless beyond a reasonable doubt because the totality of direct and circumstantial evidence of Myers' guilt was "overwhelming" *Id*. at *7. Having overruled the assignments of error, we affirmed the judgment of the trial court.

{¶ 6} Myers then appealed to the Supreme Court of Ohio, raising 32 propositions of law. After rejecting Myers' arguments, the court affirmed the convictions and death sentence. *State v. Myers*, 2002-Ohio-6658, ¶ 27 ("*Myers II*"). On one point, the court did disagree with our opinion, finding that the "other acts" testimony was properly admitted. *Id*. at ¶ 101-106. On December 31, 2002, the court denied Myers' request for reconsideration. *See State v. Myers*, 2002-Ohio-7367. The United States Supreme Court then denied certiorari in *Myers v. Ohio*, 539 U.S. 906 (2003) (filed on June 2, 2003).

{¶ 7} While Myers' direct appeal was pending in the Supreme Court of Ohio, he asked the trial court in May 1999 to appoint postconviction counsel; the court did so in June 1999. Counsel filed a postconviction petition in September 1999, a first amended petition later that month, and a second amended petition in November 1999. In the petitions, Myers asserted 36 claims for relief. *See State v. Myers*, 2001 WL 929934 (2d Dist. Aug. 17, 2001) ("*Myers III*"). After the trial court granted summary judgment to the State, Myers filed a notice of appeal in April 2000.

{¶ 8} On appeal, Myers asserted five assignments of error, including that trial counsel was ineffective. We noted that the petition was supported by the affidavit of William Summers, Myers' trial counsel, who claimed he rendered ineffective assistance of counsel for several reasons, including: (1) he was unprepared for trial due to his involvement in other

significant cases the year before trial; (2) he became ill during trial; (3) he was unfamiliar with DNA evidence; and (4) co-counsel entered the case shortly before trial when it was too late to call a DNA expert. *Id*. at *2-5. The petition was also supported by affidavits of co-counsel, Barry Wilford, former counsel, Dennis Pusateri (who had been Myers' attorney from 1990 until mid-1993), and Christine Watson, Summers' paralegal. All three criticized Summers' trial performance. In addition, Myers attached the affidavit of Kim Grimes (the ex-wife of Gregg Grimes) and the affidavit of an investigator for the Ohio Public Defender's Office. *Id*. at *5-11, 14.

{¶ 9} In reviewing the matter, we considered all claims that Myers had presented in the postconviction petition. We rejected them all on various grounds, including that they were barred by res judicia, were unsupported by cogent evidence outside the appellate record, should have been raised at trial or on direct appeal, or were not supported by substantive grounds. *Myers III* at *11-25.

{¶ 10} After we affirmed the trial court's postconviction decision, Myers appealed to the Supreme Court of Ohio, but the court declined to accept the appeal. *See State v. Myers*, 2003-Ohio-259 ("*Myers IV*") (issued on January 29, 2003). As noted above, the month before, the Supreme Court of Ohio had rejected Myers' claims in the direct appeal of the murder judgment. *See Myers II*, 2002-Ohio-6658.

{¶ 11} On September 30, 2003, Myers filed an application with our court seeking to reopen his direct appeal. *State v. Myers*, No. 1996 CA 0038 (2d Dist. Sept. 30, 2003) ("*Myers V*"). After we denied the application on November 26, 2003, Myers again appealed to the Supreme Court of Ohio on January 1, 2004. The court affirmed our judgment, finding the application to reopen was time-barred because Myers did not file his application until four years after his postconviction counsel had been appointed. The court also found Myers'

9

claims lacked merit. *See State v. Myers*, 2004-Ohio-3075, ¶ 4-8 ("*Myers VI*"). This decision was issued on June 30, 2004, and Myers did not further appeal.

{¶ 12} In the meantime, Myers had begun federal habeas proceedings in federal district court. On January 5, 2004, Myers filed an application for a stay of execution pending filing of a habeas petition, notice of his intent to file a habeas petition, and a request for appointed counsel. *See Myers v. Bagley*, No. 1:04-mc-00001-ALM-NMK (S.D.Ohio Jan. 5, 2004) ("*Myers VII*").[1] On January 23, 2004, the district court stayed the execution and appointed counsel for Myers. Subsequently, on May 21, 2004, Myers filed his first petition for a writ of habeas corpus. The petition was 166 pages long and contained 34 claims for relief. The habeas case was quite active in 2004 and 2005, including the court's approval in June 2005 of Myers' "proposed budget." The case was also fairly active in 2006 and 2007, when the court approved Myers' filing of a "revised proposed budget" under seal in late May 2007.

{¶ 13} In 2008, a few filings were made (mainly concerning payment of attorney fees), and in 2009, only one document was filed. Nothing more occurred in the habeas case until early December 2010, when the court ordered Myers "to consult with CJA Budgeting Attorney Robert Ranz in developing a budget and to file proposed budget, ex parte and under seal" within 30 days of the court's order. A second revised preliminary budget was filed within the appropriate time in January 2011. Several filings occurred in 2011, although nothing substantial, and the next docket entry did not occur for more than three years, when a joint motion for a scheduling order was filed in January 2015.

---

1. Concerning the habeas case, we have reviewed the federal court docket, which is available online on PACER. Under established authority, we may take judicial notice of matters that are publicly available on the internet. *E.g.*, *Clark v. Beyoglides*, 2021-Ohio-4588, ¶ 6, fn. 1 (2d Dist.). All references to dockets relating to Myers' many pleadings have been verified in this manner.

{¶ 14} During 2015, several events occurred, including the warden's (Bagley's) refiling of the state record, the district court's grant of permission to Myers to file an amended habeas petition (which was filed in late August 2015), and the warden's filing of appendices. The amended habeas petition was 164 pages in length, also contained 34 claims, and was quite similar to the 2004 petition. Although some filings were made in 2016 through 2018, nothing of particular substance occurred other than the court's denial in September 2017 of Myers' motion to file a second amended habeas petition. More than a year then passed, then in October 2018, Myers filed a motion asking the court to appoint counsel, which the court did in November 2018. Notably, Myers was represented by counsel throughout the federal habeas case.

{¶ 15} No more filings occurred in the habeas case until March 29, 2019, when Myers' counsel, Carolyn Wright, filed a motion to conduct DNA testing and to conduct discovery. Ultimately, in February 2020, the district court granted Myers' motion for leave to conduct discovery. *See Myers v. Bagley*, 2020 WL 633317 (S.D.Ohio Feb. 11, 2020).

{¶ 16} On July 10, 2020, Myers filed a joint status report, which included a proposed testing order. After the warden moved for a revised testing order, the court issued a revised order on July 21, 2020. Nothing more of any substance occurred for nearly two years until Myers filed a joint status report on June 28, 2022, which included the attachments "Exhibit 1 - Clement DNA Report, # 2 Exhibit 2 - Schiro DNA Report." *Myers VII*, Joint Status Report (S.D.Ohio June 28, 2022).

{¶ 17} Shortly before that filing in the habeas case, on June 21, 2022, Myers filed the following pleadings in his common pleas court case: a petition for postconviction relief (the "Relief Petition") and a motion for leave to file a motion for new trial ("leave motion"), plus appendices. In late April 2023, Myers filed amended pleadings concerning these matters,

again with appendices. After the State filed a response and Myers replied, a new judge was assigned to the case. Then, on February 26, 2024, the court granted Myers leave to file the motion for new trial, and Myers did so on February 28, together with an appendix.

**{¶ 18}** In July 2024, the court held combined hearings on both the Relief Petition and motion for new trial. After hearing the evidence, the court granted the motion for new trial and filed a separate judgment granting Myers' Relief Petition. *See* Judgment Entry – Granting Defendant's Motion for New Trial (Aug. 6, 2024) ("New Trial Judgment"), and Judgment Entry – Granting Petition for Postconviction Relief (Aug. 6, 2024) ("Relief Petition Judgment").

**{¶ 19}** The State then filed a notice for leave to appeal the grant of leave to file a motion for new trial and for leave to appeal the grant of the new trial, as well as a notice of appeal concerning the grant of the Relief Petition. We granted the state leave to appeal on September 4, 2024, the parties filed briefs, and oral argument was held. The matter has now been submitted for consideration.

**{¶ 20}** The State has asserted six assignments of error: one concerns the entry granting the motion for leave to file a motion for new trial; one pertains to the judgment granting a new trial; and four relate to the judgment granting the petition for postconviction relief. We begin by considering the motion for leave.

## II. Grant of Leave to File Motion for New Trial

**{¶ 21}** The State's first assignment of error states:

The trial court abused its discretion in granting Defendant's Motion for Leave.

**{¶ 22}** Under this assignment of error, the State presents three main arguments about the grant of Myers' motion for leave. The State claims the court abused its discretion: (1) in concluding that Myers was unavoidably prevented from discovering new DNA evidence; (2)

by holding the State to an unsupported standard of law; and (3) by considering the merits of the motion for new trial before granting the motion for leave.

{¶ 23} We consider these points separately, along with any associated arguments. Before doing so, we outline legal standards that pertain to new trial motions and motions for leave.

A. Relevant Standards

{¶ 24} As pertinent here, Crim.R. 33(A)(6) allows new trials to be granted where "new evidence material to the defense is discovered which the defendant could not with reasonable diligence have discovered and produced at the trial." An additional requirement is that the evidence must have materially affected the defendant's "substantial rights." Crim.R. 33(B) requires such motions to be filed within 120 days after a jury verdict was rendered. Clearly, Myers failed to meet this standard. However, defendants may file untimely motions if they prove, by clear and convincing evidence, that they were unavoidably prevented from discovering the evidence on which they must rely. *Id*.

{¶ 25} In the case of an untimely motion for new trial, a two-step process occurs, with a motion for leave being filed first. If the court decides the burden has been met, the defendant will then file the new trial motion. "When a defendant seeks leave to file a motion for a new trial under Crim.R. 33(B), the trial court may not consider the merits of the proposed motion for a new trial until after it grants the motion for leave." *State v. Hatton*, 2022-Ohio-3991, ¶ 30, citing *State v. Bethel*, 2022-Ohio-783, ¶ 41.

{¶ 26} "'The "unavoidably prevented" requirement in Crim.R. 33(B) mirrors the "unavoidably prevented" requirement in R.C. 2953.23(A)(1),'" the postconviction relief statute. *Bethel* at ¶ 59, quoting *State v. Barnes*, 2018-Ohio-1585, ¶ 28 (5th Dist.). "To meet this standard, courts in Ohio have . . . held that a defendant ordinarily must show that he

13

was unaware of the evidence he is relying on and that he could not have discovered the evidence by exercising reasonable diligence." *Id*. at ¶ 21, citing *State v. Harrison*, 2018-Ohio-1396, ¶ 6 (8th Dist.). "'Unavoidable' means 'not avoidable' or 'inevitable.'" *State v. Johnson*, 2024-Ohio-134, ¶ 24, quoting *Merriam-Webster's Collegiate Dictionary* (11th Ed. 2003). In this regard, the Supreme Court of Ohio has stressed that untimely parties "must show that any delay in discovering the facts undergirding the petition was 'incapable of being avoided or evaded.'" *Id.*, quoting *Merriam-Webster's Collegiate Dictionary*.

{¶ 27} Clear and convincing evidence has long been defined as "that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus. "Where the proof required must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *State v. Schiebel*, 55 Ohio St.3d 71, 74 (1990), citing Ford *v. Osborne*, 45 Ohio St. 1 (1887), paragraph two of the syllabus.

{¶ 28} Appellate courts review new trial decisions for abuse of discretion. *Hatton,* 2022-Ohio-3991, at ¶ 29. "A trial court abuses its discretion when it makes a decision that is unreasonable, unconscionable, or arbitrary." *State v. Darmond*, 2013-Ohio-966, ¶ 34, citing *State v. Adams*, 62 Ohio St.2d 151, 157 (1980). "An abuse of discretion most often involves an unreasonable decision that is not supported by a sound reasoning process." *State v. McHenry*, 2021-Ohio-3118, ¶ 16 (2d Dist.), citing *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161 (1990). However, to the extent legal

questions are involved, de novo review applies. *State v. Scott*, 2025-Ohio-300, ¶ 14 (2d Dist.), citing *State v. Grad*, 2024-Ohio-5710, ¶ 47.

{¶ 29} With these standards in mind, we turn to the State's first argument.

B. Whether Myers Was Unavoidably Prevented from Discovering New Evidence

{¶ 30} According to the State, the trial court abused its discretion in finding that Myers was unavoidably prevented from discovering new DNA evidence. The "new evidence" in question pertains to DNA tests conducted on the railroad spike and the three rocks found in the victim's vagina. In its later decision on the merits of the new trial motion, the trial court also mentioned two cigarette butts the State itself tested in 2024. *See* New Trial Judgment, p. 2.

{¶ 31} As noted, Myers' motion for leave was filed on June 21, 2022. The record related to that motion and the Relief Petition is voluminous. About 20 months after that motion was filed, the court issued a decision granting the motion for leave. At that time, the court considered only the DNA evidence. *See* Judgment Entry – Granting Leave for Defendant to File Motion for New Trial (Feb. 26, 2024) ("Leave Judgment").

{¶ 32} In concluding that the leave motion should be granted, the court first found that "[w]hile affidavits are not required until the merits of the motion are considered, the facts at this stage of the process are unrebutted that the newly discovered evidence was not available until 2021 at the earliest." *Id*. at p. 9. The court further found that Myers "possessed no knowledge of any exculpatory evidence until June 2021 when the first DNA report was prepared." *Id*.

{¶ 33} The court went on to find that Myers exercised diligence in attempting to discover the "new" evidence because the DNA methods being used were not available in 1996; Myers tried to preserve evidence from 1999 onwards; and the "new" evidence only

became apparent in 2021 after Myers obtained a federal district court order for DNA testing. *Id*. at p. 11. Finally, though the court acknowledged that the more advanced DNA tests "may have been within the common knowledge of the counsel, defendants and the public," it was conjecture whether Myers "understood these advanced methods, their possible evidentiary value, and when he might have known." *Id*. at p. 12. The court further explained its reasoning as follows:

> **First**, the Defendant sought additional DNA testing in 1999; however, the trial court denied the request. It does not appear prudent for the Defendant to have repeatedly challenged the Court after it clearly denied the request in the first instance. **Second**, the Defendant has been indigent since the earliest parts of the prosecution of this case. If, as suggested by counsel, DNA costs fell in the range of $5,000 to $50,000, then clearly the Defendant was financially prevented from conducting the tests and discovering the evidence. (See Defendant's Exhibit 11). **Third**, the Defendant did not possess access to the evidence items. After 1999 when DNA testing was denied by the trial court, there was no further ability for the Defendant to independently discover the existence of the male DNA and realize its potential evidentiary value. **Fourth**, though only tangentially relevant, if the State could not locate evidence concerning this offense until June 2022, in spite of the 1999 preservation order, how can the Defendant be expected to know what evidence exists and whether it has evidentiary value? (These recently discovered items had no evidentiary value.)

(Emphasis in original.) *Id.* at p. 12-13. The court, therefore, found that Myers was unavoidably prevented from discovering the new evidence and granted the motion for leave to file a motion for new trial. *Id*. at p. 13.

C. Being Unavoidably Prevented From Discovering Evidence and Reasonable Diligence

{¶ 34} As a preliminary point, the trial court's analysis, as expressed, was based on incorrect assumptions and standards. The trial court's decision focused on the rejection of Myers' 1999 request for DNA testing, the alleged cost of testing, and its own conjecture that Myers' did not understand DNA advances, despite awareness by the general public and his counsel. Yet Myers has been represented by counsel at all relevant times since first being indicted in 1988, and "an attorney's knowledge of facts is ordinarily imputed to the attorney's client." *State v. Carson*, 2004-Ohio-2741, ¶ 17 (2d Dist.). *See also State v. Jackson*, 2004-Ohio-5103, ¶ 11 (3d Dist.) ("In exercising reasonable diligence, [defendant] should have filed the motion for leave to file a motion for new trial as soon as he or his counsel gained knowledge of the ground for a new trial.")

{¶ 35} Without outlining exhaustive details on the many attorneys who have represented Myers in his voluminous state and federal proceedings, we note that he has been continuously represented by competent appointed and pro bono counsel. *E.g.*, *Myers I*, 1999 WL 94917; *Myers II*, 2002-Ohio-6658; *Myers VII*, No. 1:04-mc-00001-ALM-NMK (S.D. Ohio Jan. 5, 2004). The point here is that we cannot find that Myers lacked the ability to understand advances in DNA testing when he had substantial assistance from many highly competent attorneys from 1996 to 2022, when his motion for leave was filed.

{¶ 36} The trial court noted the cost of DNA testing, as "suggested" by defense counsel, and Myers' indigence during most of the case. In the first place, the court cites only Defendant's Ex. 11 for its comment about funding. *See* Leave Judgment, p. 12. However,

this exhibit is simply Myers' affidavit, in which he comments on his indigence as a basis for being unavoidably prevented from timely filing his motion. Contrary to the trial court's implication, indigence is not a factor. A defendant's "incarceration, without more, does not amount to clear and convincing proof that he was unavoidably prevented from discovering the evidence within the time limitations of Crim.R. 33(B)." *State v. Peterson*, 2020-Ohio-4579, ¶ 20 (10th Dist.), citing *State v. Smith*, 1998 WL 404458, *5 (2d Dist. Mar. 27, 1998). *Accord State v. Knowlton*, 2024-Ohio-5869, ¶ 46 (11th Dist.). Implicit in this principle is that many defendants are indigent or lack funds.

**{¶ 37}** The trial court also cited cases that were "similar" and "helpful" to its leave decision. *See* Leave Judgment, p. 7-9, citing *Hatton*, 2022-Ohio-3991, *Bethel,* 2022-Ohio-783, and *State v. McNeal*, 2022-Ohio-2703. In all these cases, the State suppressed evidence favorable to the defendant in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). *See Hatton* at ¶ 31-36; *Bethel* at ¶ 24-30; *McNeal* at ¶ 21-23. In *Bethel,* the prosecution had suppressed a report implicating other parties in murders for which the defendant had been convicted. *Id*. at ¶ 2, 14. The convictions occurred in 2003, and the defendant may have discovered the report possibly in 2008, but the date of discovery was unclear. *Id*. at ¶ 14, 16, 18.

**{¶ 38}** In any event, the defendant in *Bethel* filed a second postconviction petition and a motion for leave to file a motion for new trial in 2018, which were rejected by the trial and appellate courts. The trial court reasoned the defendant was not unavoidably prevented from discovering the evidence because his attorneys "could have uncovered the information by talking to" witnesses they were aware of at trial. *Id*. at ¶ 1-3, 15, 22. Using similar reasoning, the court of appeals found that "a 'defendant cannot claim evidence was undiscoverable

simply because no one made efforts to obtain the evidence sooner.'" *Id*. at ¶ 23, quoting *State v. Bethel*, 2020-Ohio-1343, ¶ 20 (10th Dist.).

{¶ 39} The Supreme Court of Ohio held, however, that lower courts had placed a burden on the defendant that was inconsistent with *Brady*. Specifically, the court noted that "[a] defendant seeking to assert a *Brady* claim . . . is not required to show that he could not have discovered suppressed evidence by exercising reasonable diligence." *Bethel*, 2022-Ohio-783, at ¶ 25, citing *Strickler v. Greene*, 527 U.S. 263, 282-285 (1999). The court, therefore held that "when a defendant seeks to assert a *Brady* claim in an untimely or successive petition for postconviction relief, the defendant satisfies the 'unavoidably prevented' requirement contained in R.C. 2953.23(A)(1)(a) by establishing that the prosecution suppressed the evidence on which the defendant relies." *Id*.

{¶ 40} Thus, in cases that do not involve *Brady* claims, defendants must still show they exercised reasonable diligence with respect to untimely new trial motions and untimely successive postconviction petitions. This, in fact, is the position that the Supreme Court of Ohio has taken. *See Johnson*, 2024-Ohio-134, at ¶ 18 (clarifying that in the context of R.C. 2953.21, the petitioner may make the required showing of being unavoidably prevented "either by establishing a violation under *Brady* . . . or by demonstrating that he was previously unaware of the evidence on which the petition relies and could not have discovered it by exercising reasonable diligence"). Cases like *Bethel*, *Hatton*, and *McNeal* are not similar because the defendants in those cases were not required to make a showing of reasonable diligence.

{¶ 41} The case before us does not involve a *Brady* claim, so Myers still had the burden to establish that he acted with reasonable diligence. *Bethel* is only relevant in that the Supreme Court of Ohio rejected the view of many appellate districts that defendants

19

must file a motion for leave to file a motion for new trial within a "reasonable time" after discovering new evidence. The Supreme Court reasoned that because Crim.R. 33(B) prescribes the circumstances under which defendants can seek new trials, trial courts cannot add a requirement not mentioned in the rule. *Bethel*, 2020-Ohio-1343, at ¶ 51-57.

{¶ 42} On the issue of reasonable diligence, Myers knew in 1996 or before that the foreign pubic hair found on the victim's body had been consumed in testing and that no further or advanced DNA analysis would be possible. In fact, the pubic hair was no longer available even as of 1989, when it was last tested by Dr. Blake, because it was used up during DNA testing. *See* 1996 Trial Transcript ("Tr.") 1681-1685, 1945-1948, 1985.[2] As a result, any developments in DNA technology would be irrelevant to this evidence. Myers was also aware from the beginning of the case that the railroad spike that had been driven through Amanda's head and the rocks discovered in her vagina had been collected and were available for testing. In fact, the spike and rocks were tested for sperm in 1988, and Ohio Bureau of Criminal Investigation ("BCI") forensic scientist Michelle Yezzo found no sperm on the rocks. Tr. 1590-1592. Myers did not request any additional testing between 1988 and 1996, nor did he ask for DNA testing of these items during that time. As the State points out, the proper focus is the time of trial in 1996, not what occurred in 1988.

{¶ 43} "There is a material difference between being unaware of certain information and being unavoidably prevented from discovering that information, even in the exercise of due diligence." *State v. Warwick*, 2002 WL 1585663, *3 (2d Dist. July 19, 2002). *Accord State v. Lenoir*, 2016-Ohio-4981, ¶ 24 (2d Dist.); *State v. Smith*, 2023-Ohio-4800, ¶ 48 (10th Dist.). "We have held that a defendant fails to demonstrate that he or she was

---

2. For ease of reading, we do not insert commas for references to transcript page numbers over 999.

20

unavoidably prevented from discovering new evidence when he would have discovered that information earlier had he or she exercised due diligence and some effort." *Lenoir* at ¶ 24, citing *State v. Metcalf*, 2015-Ohio-3507, ¶ 11 (2d Dist.). Given that Myers was aware of the existence of the rocks and the spike and given that he was represented by counsel at all relevant times, the delay in seeking testing is troubling. Developments in technology were well-known and accepted in courts long before Myers filed the federal court motion for testing in 2019.

{¶ 44} Nonetheless, as noted, *Bethel* recently held that courts may not impose a reasonable time limit for filing a motion for leave after discovering new evidence, which was a practice courts in Ohio had formerly followed. Again, in this vein, the Ohio Supreme Court reasoned that the language in Crim.R. 33(B) and the other Rules of Criminal Procedure lack such a specific requirement. *Bethel,* 2022-Ohio-783, at ¶ 51-57. Although we believe the delay in filing between 1996 and 2022 was clearly excessive, it appears that in reviewing a motion for leave to move for a new trial, we can no longer consider a failure to file within a reasonable time. In our opinion, there is a difference between failing to exercise diligence in discovering new evidence and failing to file within a reasonable time after discovering it. Had we been able to decide the case on this basis, and for the reasons discussed here and below, we would have found that Myers failed to exercise reasonable diligence in discovering new evidence. However, another decision of the Supreme Court of Ohio also impacts our analysis.

{¶ 45} The trial court filed its decision in July 2024, when it did not have the benefit of the December 2024 decision of the Ohio Supreme Court in *Grad*, 2024-Ohio-5710. In *Grad*, the defendant was charged in 2008 with felonious assault and endangering his two-month-old son after the child was discovered to have sustained multiple fractures. The child's

21

mother was also charged, and she was convicted in 2009. *Id*. at ¶ 5, 8, fn. 1. The father's case ultimately was tried in late 2014, with the father arguing before trial that evolving changes in science would indicate that the fractures were due to evidence of a metabolic bone disorder rather than imposed fractures. Although the father was given money for experts and had retained three, his attorney did not present an expert at trial; instead, he only cross-examined the State's expert. *Id*. at ¶ 8-13.

{¶ 46} The father was convicted and sentenced to 24 years in prison. After his postconviction petition based on ineffective assistance of trial counsel was rejected, in October 2021, he filed an motion for leave to file an untimely motion for new trial. The motion was based on four studies done between 2016 and 2021 that allegedly contradicted the doctor's trial testimony. The father also included new information about the child's family medical history. *Id*. at ¶ 35-40. After the trial court denied the motion without a hearing, the court of appeals affirmed. The Ohio Supreme Court then accepted the father's appeal. *Id*. at ¶ 44-46.

{¶ 47} On appeal, the court reversed the lower court decisions and remanded the case for a hearing on the motion for leave to file a motion for new trial. *Grad*, 2024-Ohio-5710, at ¶ 82. In this regard, a few observations are in order. First, *Grad* was a plurality opinion. Only two members of the court agreed with the lead opinion, one member concurred in the judgment only, and three justices dissented. "A plurality opinion does not constitute binding authority, but a court may rely on a plurality opinion if it finds the opinion to be persuasive." *State ex rel. Elmore v. Franklin Cty. Bd. of Elections*, 2025-Ohio-2585, ¶ 19, citing *NASCAR Holdings, Inc. v. Testa*, 2017-Ohio-9118, ¶ 18. *Accord In re Adoption of J.R.I.*, 2023-Ohio-475, ¶ 30 (2d Dist.).

22

{¶ 48} *Grad* is not particularly persuasive. The lead opinion in *Grad* stated that "new scientific evidence may constitute newly discovered evidence under Crim.R. 33(A)(6) and (B). In particular, when scientific evidence provided substantial support for an element of a crime at trial, a significant posttrial change in the state of scientific knowledge concerning that trial evidence may constitute newly discovered evidence." *Grad*, 2024-Ohio-5710, at ¶ 63. The lead opinion declined "to define the degree of change required in terms of a 'quantum leap,' or another term that focuses on how dramatically the change is perceived by the scientific community." *Id*. at ¶ 64, quoting *State v. Butts*, 2023-Ohio-2670, ¶ 70 (10th Dist.). This is not particularly helpful, since opinions can easily vary on how "significant" a change may be.

{¶ 49} The lead opinion did "recognize that determining whether a change in scientific evidence is *significant* when judging a motion for leave differs somewhat from the question at the center of a motion for a new trial—which involves convincing the court that the new evidence 'discloses a strong probability that it will change the result if a new trial is granted,'" (Emphasis in original.) *Id.* at ¶ 65, quoting *Petro*, 148 Ohio St. 505, at syllabus. Notably, *Grad* involved only a motion for leave, not a new trial motion, which imposes a higher standard, as the court stressed.

{¶ 50} The lead opinion further remarked that "[t]he significance question at the motion-for-leave stage relates to the fact that a scientific study may be new, having been published after trial, but the trial court should still consider the extent to which the evidence would provide greater assistance defending against the indictment in a new trial than was available to the defendant at trial. Requiring the change in scientific knowledge to be significant such that it offers new evidence to support a stronger argument in defense of the charges—so that a different outcome *could* be reached if a trial were held today—ensures

23

that a trial court need not grant leave for evidence of a recently published study that would have only a *de minimus* impact in a new trial." *Grad* at ¶ 65. A good amount of room exists between "significant" and "*de minimis*," which again could lead to somewhat subjective decisions.

{¶ 51} The lead opinion also stressed that "[n]otably, at the motion-for-new-trial stage, the defendant must clear a higher bar after the court first grants leave to file the new-trial motion." *Grad*, 2024-Ohio-571, at ¶ 66. Finally, the lead opinion stated that in assessing a motion for leave:

> [T]he growth of scientific knowledge must be considered in respect to the case at issue. A court must first evince a clear understanding of what the new scientific evidence shows. It must then compare that evidence to the level of similar-subject scientific evidence available at the time of trial. In doing so, it must query whether, if the trial were to occur today, the new evidence would provide the defendant with a significantly stronger argument for his defense such that it could have the effect of leading to a different outcome. If the answer is yes, then the defendant has presented "clear and convincing proof that the defendant was unavoidably prevented from the discovery of the evidence upon which he must rely," Crim.R. 33(B), and the motion for leave should be granted.

*Grad*, 2024-Ohio-5710, at ¶ 64. The dissent did not agree to the use of this particular test, and in fact disagreed with the lead opinion's application of the concept of newly discovered evidence in the case before it. *Id*. at ¶ 84-97 (Deters, J., dissenting).

{¶ 52} Nonetheless, for the sake of argument, we apply the test outlined by the plurality opinion in *Grad*. In its leave decision, the trial court briefly summarized the results

24

of the DNA testing, which excluded Myers' DNA from two items of evidence: one of the rocks and the spike. Leave Judgment, p. 3-4. The court did not compare the "new evidence" to the level of similar subject matter in 1996; instead, the court simply stated that the State failed to submit any "opposing evidentiary matters." *Id*. at p. 9.

{¶ 53} This ties into the State's second point, which is that the trial court abused its discretion by holding it to an unsupported standard of law. Although the court acknowledged that affidavits are not required until a hearing is granted, the court found that "the facts . . . are unrebutted that the newly discovered evidence was not available until 2021 at the earliest." *Id*. The State contends that it had no burden with regard to the motion for leave and that it properly pointed out reasons why Myers was not unavoidably prevented from discovering new evidence. We agree with the State on this point. "The sole question before the trial court when considering whether to grant leave is whether the defendant has established by clear and convincing proof that he was unavoidably prevented from discovering the evidence on which he seeks to base the motion for a new trial." *Hatton*, 2022-Ohio-3991, at ¶ 30. This is a "narrow, preliminary question." *Id*. at ¶ 33. If the defendant meets the burden, the court will grant the motion. *Id*. at ¶ 28. Thus, the State had no burden to submit evidentiary materials in responding to the motion for leave. We note that Crim.R. 33(A)(6) does allow the prosecuting attorney to produce rebuttal affidavits or evidence at a new trial hearing, and the State did so here.

{¶ 54} Again, the trial court failed to discuss the state of similar subject matter at the time of the original trial. Instead, it made only conclusory statements. As a reference point, and for better understanding of the overall issues, we note the following points.

{¶ 55} DNA was discovered around 1953 by two scientists, an American and an Englishman. The first international use of forensic DNA occurred in a rape case in which

25

4,000 men in a small town underwent DNA testing. This resulted in an English doctor publishing a paper in a premier scientific journal in 1985, *DNA Fingerprinting*. The process in question became known as RFLP DNA fingerprinting and was patented by a British chemical company that had connections with the lab Cellmark. At the same time, a scientific group in the United States was doing similar work and established the company Life Codes in New York. Both Cellmark and Life Codes were commercial companies and used the same basic RFLP typing in their DNA typing techniques. Tr. 1983, 1985-1988.

{¶ 56} RFLP stands for "Restriction Fragment Length Polymorphism procedure," and the process was used by Cellmark in the case where the Supreme Court of Ohio first found that "DNA evidence may be relevant evidence which will assist the trier of fact in determining a fact in issue, and may be admissible." *State v. Pierce*, 64 Ohio St.3d 490, syllabus and 493 (1992). The court further remarked in *Pierce* that "[a]lthough irrelevant for the determination of admissibility under Ohio law, the theory and procedures used in DNA typing are generally accepted within the scientific community." (Citations omitted.) *Id*. at 497.

{¶ 57} "DNA is the common abbreviation for deoxyribonucleic acid. DNA is the 'fundamental natural material which determines the genetic characteristics of all life forms.'" *Id*. at 492, quoting *People v. Castro*, 144 Misc.2d 956, 961 (N.Y.Sup.Ct. 1989). "It is responsible for determining individual human characteristics, such as hair color and eye color which differentiate humans. Except for identical twins, no two individuals have the same DNA." *Id*.

{¶ 58} DNA is organized into chromosomes, which are present in pairs. Humans have 22 pairs of non-sex chromosomes and one pair of sex chromosomes. Wherever there is a gene on one pair of chromosomes, a second gene also exists. Thus, there are two traits for

each gene, and one is inherited from each parent. The term "alleles" is another word used to describe these inherited traits. Tr. 1911.

{¶ 59} When used in a forensic context, RFLP targets certain highly genetically variable genes. Tr. 1915. For example, *Pierce* involved "the statistical frequency of the occurrence of the same DNA composition in the black population. The statistical frequency was obtained by using a formula based on standard probability theory. The formula involves the multiplication of the individual probabilities for the occurrence of individual alleles (any one of a series of two or more genes) within a DNA sample." *Pierce*, 64 Ohio St.3d at 499. The disadvantage of the RFLP method is its requirement of a fairly large quantity of DNA that is in very good condition and is not degraded. When DNA degrades, it gets chopped up into smaller and smaller pieces. Tr. 1915-1917.

{¶ 60} At the time of trial, the other molecular biology procedure used to extract genetic information from DNA was polymerase chain reaction ("PCR"). That DNA method was used here, and the prosecution retained Dr. Blake to conduct PCR testing on the foreign pubic hair found on the victim's body. This technique uses small DNA pieces, generally on the order of a small gene, which are copied many times and analyzed. During this process, the foreign pubic hair sample was placed in a tube and dissolved with chemicals. The DNA in the watery solution was washed and concentrated by filtering out large molecules, and the remaining DNA was amplified by chemical reagents that caused the DQ alpha gene (the gene being studied)—and no other genes—to be copied many times over. This was done using a thermocycler, which goes up and down in temperature to create copies. The amplified DQ alpha gene was flooded in a solution over the surface of nylon strips to which DNA probes were permanently affixed. The alleles present in the amplified DNA found and stuck to the DNA probe sequences they were associated with, and this result was detected

27

by a color change in the typing strip. The patterns of colored dots were then read to decide the appropriate DQ alpha type that had been found. Tr. 1914, 1917, 1945-1950, 1954, 3298.

{¶ 61} Dr. Blake's testing used the DQ alpha gene, which is a gene that has six common alleles in the population. As indicated, each gene has two alleles or traits, and one is inherited from each parent. Taking all two-by-two combinations of the six alleles results in 21 different genotypes or 21 different ways of combining the six alleles in a two-by-two fashion. This permits populations to be divided into 21 different groups based upon the DQ alpha gene. Tr. 1911, 1932. From this testing, Dr. Blake, as well as another prosecution expert, concluded that Myers' DQ alpha gene type, 1.3, 2, matched the gene type found on the victim's pubic hair. This did not mean that Myers committed the crime; it simply meant that experts were not able to exclude him as the donor. Tr. 1938, 1967-1968, 1972, 2865-2866, 3308, 3357.

{¶ 62} The trial testimony sheds light on why Myers must have been aware of DNA evidence. In the first place, Myers was present during a very long trial where DNA was discussed. A prior hearing on the admissibility of DNA analysis was held in Myers' case in 1990, at which Dr. Blake also testified. According to Dr. Blake, the PCR process was first described in scientific literature in 1985, and his lab was one of the first in the United States to use it. Dr. Blake first used PCR in 1986 and had been using it continuously through the time of the 1996 trial. Kits containing the reagents needed to do PCR analysis became commercially available in February 1990 or 1991. Tr. 1921, 1994, 2038, 2055-2057.

{¶ 63} Myers' own trial expert, Dr. Gerdes, had a PhD in microbial genetics and bacterial pathogenesis, the predecessor of molecular biology. He had also completed a four-year post-doctoral fellowship in the field of molecular biology as applied to virology and also had testified about DNA admissibility at the 1990 hearing in Myers' case. During the 1996

28

trial, Gerdes testified about advancements in DNA PCR testing, including his laboratory's use of an HLA gene called the DR beta gene, which had "over 50 different alleles, allele types as opposed to DQ Alpha, which has seven or eight." Tr. 2803, 2809, 2810-2811. In addition, Gerdes discussed the exquisite sensitivity of PCR testing, which would have allowed him to wipe a handkerchief on a surface where someone had coughed before and be able to tell who had sat there, or at least be able to identify a type consistent with that person. Tr. 2813.

{¶ 64} In view of the testimony, Myers and his counsel were aware of the possibility of PCR testing of the rocks and railroad spike at the time of trial in 1996, or before, and were further aware of testing such as the DR beta gene, which used significantly more alleles for testing, leading to more precise identification. They were also aware that PCR testing was so sensitive that it could detect "touch DNA." It is true that newer techniques such as STR and Y-STR testing were both unavailable prior to trial. In September 2006, the First District Court of Appeals noted:

> "The Y Chromosome is the DNA in the nucleus of a cell that is present only in males." C.J. Word, The Future of DNA Testing and Law Enforcement (2001), Speech at the Brooklyn Law School Symposium on DNA: Lessons From the Past—Problems For the Future, in 67 Brooklyn L.Rev. (Fall 2001), 249, 251, fn. 5. In 1995, the best available DNA test was unable to detect a male DNA profile on a swab taken from a rape victim if no sperm was visible when the swab was examined microscopically. See P. de Mazancourt, Y–STR as Proof of Rape When Sperm Cells Cannot be Found (2002), Address Before the 13th International Symposium on Human Identification. Current Y-Chromosome Short Tandem Repeat ("Y-STR") analysis now allows the development of DNA

29

profiles where no sperm is detectable microscopically. U.S. Department of Justice (July 2002), Using DNA to Solve Cold Cases, at 5.

*State v. Elliott*, 2006-Ohio-4508, ¶ 7 (1st Dist.).

**{¶ 65}** In *Elliot*, the court reversed the trial court's denial of the defendant's request for DNA testing under R.C. 2953.71 et seq. The court reasoned that based on the underlying facts of that case, a Y-STR test would be outcome determinative concerning the defendant's convictions of two counts of rape and two counts of aggravated burglary. *Id*. at ¶ 12-26. The actual application for testing was made in September 2004, and the Ohio Innocence Project subsequently entered an appearance as counsel for the defendant. *Id*. at ¶ 4.

**{¶ 66}** Before *Elliot* was decided, the Eighth District Court of Appeals rejected a defendant's claim that his rape convictions were not supported by sufficient evidence. Among other things, the court noted the State's provision of "Y chromosome DNA testing that matched" the defendant. *State v. Braxton*, 2006-Ohio-3008 (8th Dist.), ¶ 12. *See also State v. Wallace*, 2006-Ohio-2735, ¶ 35 (8th Dist.) (finding gross sexual imposition convictions were not against the manifest weight of the evidence). This was based on evidence, including testimony about Y-STR testing, that was presented at the defendant's May 2005 trial. *Id.* at ¶ 4-18, 35. Between 2006 and 2011, more appellate districts, including our own, discussed and recognized the use of Y-STR testing. *E.g.*, *State v. Emerick*, 2007-Ohio-1334, ¶ 18 (2d Dist.), *overruled in part on other grounds by State v. Wilson*, 2024-Ohio-4712, ¶ 20 (2d Dist.); *State v. Griffin*, 2007-Ohio-4431, ¶ 11 (5th Dist.); *State v. McCarley*, 2008-Ohio-552, ¶ 29 (9th Dist.); *State v. Bell*, 2008-Ohio-3959, ¶ 41-42 (7th Dist.) (rejecting defendant's claim that Y-STR witness testimony was not based on reliable science); *State v. Warren*, 2011-Ohio-4886, ¶ 17 (11th Dist.).

**{¶ 67}** In fact, the Supreme Court of Ohio itself stated in 2010 that "[s]ince 1998, DNA testing has advanced so far that 'a DNA profile may now be developed from items which were previously unsuccessfully typed or potentially not attempted due to the compromised or limited nature of the sample,' according to one of the expert witnesses. The PCR DNA testing used in this case in 1998 has been largely replaced by two newer technologies— short tandem repeat (or STR) testing and Y-chromosome STR (or Y-STR) testing." *State v. Prade*, 2010-Ohio-1842, ¶ 20.

**{¶ 68}** In 2009, we noted a defendant's assertion "that there have been several advancements in DNA testing since his trial." *State v. Reynolds*, 2009-Ohio-5532, ¶ 13-14, 17 (2d Dist.), *overruled in part on other grounds by Wilson*, 2024-Ohio-4712. The defendant identified "three types of DNA testing that have been developed since his [September 2001] trial, namely, Y-STR, mini-STR, and touch DNA. Y-STR testing allows DNA technicians to differentiate between male and female DNA from a mixed source, and mini-STR and touch DNA permit technicians to obtain a DNA profile from very small, degraded, and compromised samples." *Id.* at ¶ 10, 17. Given the wide availability of Y-STR testing in 2006, one might question the trial court's belief that the "new evidence" could not have been discovered until 2021. However, as noted, filing within a reasonable time is not something we are allowed to consider.

D. Improper Consideration of Merits of Motion for New Trial Before Granting Leave

**{¶ 69}** The State's final argument in connection with the first assignment of error is that Myers improperly inserted many references to the DNA results obtained from the rock and the spike in his leave motion, and the trial court improperly focused on this in its decision granting leave. As the State points out, and as we have just said, the narrow issue before a trial court in considering whether to grant an untimely leave is whether the defendant was

31

unavoidably prevented from discovering the alleged newly discovered evidence; if that barrier is surmounted and leave is granted, only then does the court consider whether a new trial should be granted. Of course, some context is required as background, but the merits of the new trial motion should not be the focus when considering the leave motion.

{¶ 70} Nonetheless, given the focus in *Grad* on comparing scientific methods to methods available at the time of a defendant's trial, we must conclude that regardless of the errors in the trial court's discussion, STR and Y-STR testing were not available at the time of Myers' trial. The additional problem with the analysis in *Grad* is that it reduces the burden for obtaining leave to virtually nothing by using words like "support a stronger argument in defense of the charges" so a different outcome "could" occur, and "de minimis" evidence being what might prevent granting a motion for leave. *Grad*, 2024-Ohio-5710, at ¶ 64. These words are vague, and there is a large difference between them, leaving courts to wonder where the evidence in question might fit.

{¶ 71} The State also argues that Myers improperly tried to "bootstrap" evidence on to the motion for leave as support, when the evidence was not new evidence (i.e., criticism of forensic evidence used at trial, such as prior PCR testing on the foreign pubic hair, methods used to identify the time of death, and so on). We consider these points, to the extent necessary, when we discuss the trial court's ruling on the new trial motion.

{¶ 72} In light of the preceding analysis, we overrule the State's first assignment of error.

### III. Abuse of Discretion in Granting Motion for New Trial

{¶ 73} The State's second assignment of error is as follows:

The trial court abused its discretion in granting Defendant's Motion for New Trial.

32

**{¶ 74}** Under this assignment of error, the State contends the trial court abused its discretion in several ways when it granted Myers' motion for new trial. Before considering the State's arguments, we outline the appropriate review standards.

## A. Standards of Review

**{¶ 75}** The Supreme Court of Ohio has said that "[t]o warrant the granting of a motion for a new trial in a criminal case, based on the ground of newly discovered evidence, it must be shown that the new evidence (1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence." *State v. Petro*, 148 Ohio St. 505 (1947), syllabus, *approving and following State v. Lopa*, 96 Ohio St. 410 (1917). We refer to the six factors set forth in *Petro* as the "*Petro* factors".

**{¶ 76}** We have interpreted *Petro* as not "establishing a per se rule excluding newly discovered evidence as a basis for a new trial simply because that evidence is in the nature of impeaching or contradicting evidence. The test is whether the newly discovered evidence would create a strong probability of a different result at trial, or whether it is merely impeaching or contradicting evidence that is insufficient to create a strong probability of a different result." (Citations omitted.) *City of Dayton v. Martin*, 43 Ohio App.3d 87, 90 (2d Dist. 1987). *Accord State v. Harwell*, 2023-Ohio-3657, ¶ 23 (2d Dist.). This is a "higher bar" than is required for granting motions for leave. *Grad*, 2024-Ohio-5710, at ¶ 66. "'[A] new trial is an extraordinary measure and should be granted only when the evidence presented weighs heavily in favor of the moving party.'" *State v. Prade*, 2018-Ohio-3551, ¶ 44 (9th Dist.), quoting *State v. Gilcreast*, 2003-Ohio-7177, ¶ 54 (9th Dist.). *See also State v.*

*Prater*, 2021-Ohio-3988, ¶ 20 (10th Dist.), citing *State v. Price*, 2009-Ohio-480, ¶ 14 (8th Dist.).

{¶ 77} Decisions granting or denying motions for new trial are reviewed for abuse of discretion. *Schiebel*, 55 Ohio St.3d at 76. Again, abuse of discretion most often means the lower court decision was not based on a sound reasoning process. *McHenry*, 2021-Ohio-3118, at ¶ 16 (2d Dist.), citing *AAAA Ents.*, 50 Ohio St.3d at 157.

### B. Other Forensic Evidence

{¶ 78} In its initial argument, the State makes two points. First, the State contends the trial court went beyond its own entry granting a new trial, which limited consideration to the DNA found on the rock and the spike. The State also argues the court abused its discretion by considering forensic evidence other than the DNA evidence. This relates to the fifth and sixth *Petro* factors, which require that the new evidence "is not merely cumulative to former evidence" and "does not merely impeach or contradict the former evidence." *Petro*, 148 Ohio St. at 505.

{¶ 79} In this regard, the State notes that Myers' motion for leave was based only on the DNA evidence (from the rock and the spike), and the court's leave decision granted the motion for leave only on that basis. According to the State, the trial court nonetheless improperly considered more items in granting a new trial, including criticisms about other forensic evidence presented at trial, such as analysis of the foreign pubic hair and using gastric content to decide the time of death. These were matters relevant only to the postconviction petition.

{¶ 80} Anticipating that the hearing would combine both motions, the State expected testimony on forensic evidence other than the rock and the spike. The State accordingly filed a pre-hearing liminal motion on this point. However, the trial court failed to rule on the liminal

34

motion. As a result, the State renewed its objection at beginning of the July 2024 hearing. Rather than making a ruling at that point, the court told the State to "remind" it when Myers presented evidence pertinent to the postconviction motion rather than the new trial motion. The State did do so when Myers presented expert testimony on the other forensic issues. *See* State's Brief, p. 44-45; New Trial Tr. 402. According to the State, the trial court scolded it when it renewed its objection, which revealed the court's intent to improperly consider the other forensic evidence in ruling on the new trial motion. State's Brief, p. 48.

{¶ 81} The trial court did say at that point during the hearing that it would not hold against the State any alleged "delay" in objecting. New Trial Tr. 402-405. In reality, however, the State did not delay. It filed a liminal motion before the hearing, which the court never ruled on. The State properly renewed its objection at the beginning of the hearing, and the court declined to rule on it at the time. The State's renewed objection also occurred when Myers began to present testimony criticizing the testimony of the experts from his trial who had testified about the foreign pubic hair, gastric contents of Amanda's stomach, marks on her neck, and the appearance of her eyes. *See* New Trial Tr. 402-495, 497-624, 638-700 (testimony of Maria Cuellar, Mark Taylor, and Katherine Maloney, who criticized trial experts).

{¶ 82} The trial court began its decision regarding the new trial by stating that Myers' motion was based on the DNA evidence from the railroad spike and one of the rocks found in the vagina. New Trial Judgment, p. 2. The court acknowledged that new trial motions and postconviction petitions are "independent claims with different procedures." *Id*. at p. 4. However, despite noting these points, the court expressed difficulty in discerning whether testimony at the hearing applied to one particular motion, as opposed to the other. As a result, the court concluded that the "testimony was regularly applicable to both claims and,

therefore, is considered in both contexts." *Id*. at p. 5. Following these comments, the court outlined expert criticism of the DQ Alpha testing of the foreign pubic hair, which was not related to the new trial motion. *Id*. at p. 6-7, 12-14, 16.

{¶ 83} The trial court's decision was not based on sound reasoning. We reviewed the same evidence and had no trouble distinguishing between the testimony related to each motion. For example, the entire testimony outlined in pages 12-14 of the court's decision relates solely to the review and criticism of Dr. Blake's techniques and DNA analysis of the pubic hair. This had nothing to do with the alleged "newly discovered" DNA evidence from the rock and the spike. The court exacerbated its error by stating in its decision that the expert witnesses at Myers' trial, including those who had testified about the testing of the foreign pubic hair, the gastric contents of the victim's stomach, and the autopsy "likely would have been unwilling to express their prior opinions" at a new trial. *Id*. at p. 27. This was pure speculation.

{¶ 84} In further reviewing the trial court's new trial order, we consider the court's discussion of each *Petro* factor and the parties' positions, to the extent relevant. Before doing so, we note that the court's analysis began with an incorrect premise. In the court's view, the "crux" of the motion was whether one DNA method was reliable enough to undermine another. New Trial Judgment, p. 19. The court went on to state, "More specifically, is the Defendant's newly discovered DNA evidence – which purportedly excludes the Defendant from the crime scene – sufficiently reliable to undermine the integrity of the trial verdict?" *Id*. The court then found, as a "short answer," that the DNA advances were significant improvements to the Alpha DQ test and exposed weaknesses in it. *Id*. Again, that had nothing to do with the new trial motion.

**{¶ 85}** A number of other problems exist concerning these statements in the court's analysis. First, in deciding new trial motions, courts must consider all evidence from the prior trial, not just one piece of evidence. Second, even if one accepts the absence of Myers' DNA on the rock and the spike as true (which remains to be seen, given the State's challenge to the results), this does not automatically "exclude" Myers from the crime scene. The analysis of the court of appeals in *Prade*, 2018-Ohio-3551 (9th Dist.), is instructive. In *Prade*, the defendant's wife was shot several times in her minivan in 1997, and there was evidence of a struggle. The killer left a severe bite mark on the underside of the wife's upper left arm. Because the wife, a doctor, was wearing a lab coat at the time, a section of her coat was removed for DNA testing. During trial, evidence was presented from DNA experts and bite mark identification experts, which included three dental experts. *Id*. at ¶ 16-17, 21.

**{¶ 86}** Before the original trial, PCR testing was used on three areas of the bite-mark section. However, because the section was saturated with the wife's blood, only a single DNA profile was obtained, which was consistent with the wife's DNA. *Id*. at ¶ 18. "New DNA results that Mr. Prade obtained in 2012, more than 14 years after Dr. Prade's murder, were the catalyst behind his request for a new trial. The new tests were conducted using Y chromosome short tandem repeat testing ('Y-STR testing') and, for the first time, male DNA was discovered within an area of the bite mark section. Because Mr. Prade was definitively excluded as the source of that male DNA, he argued that there was a strong probability the new DNA evidence would result in a different verdict, if submitted to a jury." *Id*. at ¶ 22.[3]

**{¶ 87}** Ultimately, after considering testimony about low amounts of DNA available to be tested, possible contamination and degradation issues, and the evidence from the

---

3. Notably, the Y-STR testing in *Prade* began in 2010, which again shows that testing was readily available long before Myers pursued it. *Prade* at ¶ 26. As previously indicated, this type of testing was used and accepted even before *Prade*.

original trial, the court of appeals agreed with the trial court's rejection of the new trial motion. *Id*. at ¶ 23-44. The court found the defendant failed to show a strong possibility that the DNA results would change the result if a new trial were ordered, noting that a """slight possibility"" is insufficient. *Id*. at ¶ 41, quoting *State v. Murley*, 2009-Ohio-6393, ¶ 26 (2d Dist.), quoting 90 Ohio Jur.3d, Trial, § 665 (2009).

{¶ 88} Having first noted the incorrect premise upon which the trial court's decision was based, we now consider the court's decision on the *Petro* factors, beginning, as the trial court did, with the second and third factors.

### C. Second and Third *Petro* Factors

{¶ 89} The second and third *Petro* factors ask whether the new evidence "has been discovered since the trial" and "is such as could not in the exercise of due diligence have been discovered before the trial." *Petro*, 148 Ohio St. 505, at syllabus. The trial court found that the second factor had been established because though the rock, the railroad spike, and cigarette butts had been collected before trial, "touch" DNA testing did not exist at that time. New Trial Judgment, p. 21. In addressing the "due diligence" factor, the trial court relied on its prior analysis from its grant of leave for Myers to file a motion for new trial. *Id*.

{¶ 90} *Petro* refers to due diligence in the context of whether the new evidence could have been discovered *before* trial. *Petro* was decided in 1947, well before the Rules of Criminal Procedure were adopted in July 1973 and before scientists used DNA testing of any kind. Indeed, DNA was not discovered until 1953. Where untimely motions for new trials are involved and asserted scientific theories were not available at trial or have advanced since trial, the issue of whether the evidence could have been discovered "before" trial is irrelevant. Thus, *Petro's* third factor is not helpful in this case. The factor could be relevant where the defendant's claim is based on testimony of a witness who did not testify at trial.

Such an inquiry would relate to whether the defendant knew about the witness' identity and failed to properly investigate.

{¶ 91} Likewise, in *Petro*, the "newly discovered evidence" claim was based on an affidavit from a police officer who was present at the morgue when the coroner examined the body. At that time, the coroner said the victim had been dead for about 60 hours, and the officer put that time in his report. *Petro*, 148 Ohio St. at 507. The Supreme Court of Ohio did not consider whether the defendant could have discovered and produced the evidence at trial if he had exercised due diligence. The court's decision was based solely on the fact that the coroner had been thoroughly examined at trial about the time the victim had been dead, and the officer's testimony would "merely tend to impeach that of the coroner." *Id*. at 509.

{¶ 92} Notably, on the same day *Petro* was issued, the court reversed the same defendant's murder conviction due to trial court errors. Those errors included "overruling defendant's motion requiring the prosecuting attorney to furnish him with a bill of particulars and . . . overruling defendant's objection to the conduct of the prosecuting attorney in his closing argument to the jury." *State v. Petro*, 148 Ohio St. 473, 502-503 (1947).

{¶ 93} Furthermore, the case *Petro* followed in its syllabus is of little assistance because it fails to discuss due diligence or even when the alleged new evidence in question was discovered. *See Lopa*, 96 Ohio St. 410. In that case, the Supreme Court of Ohio reversed the grant of the defendant's new trial motion because the affidavits the defendant submitted were cumulative and impeaching the affiants would probably not have changed the result of the trial. Another affidavit even involved a witness the defense had the ability to cross-examine at trial. *Id*. at 411-412.

{¶ 94} The point here is not that *Petro* and *Lopa* should be discarded. Rather, these decisions are brief, the discussion is sparse, and the due diligence factor is not helpful in cases like the present one. The factor is relevant in certain situations, but not this one.

{¶ 95} Considering the elimination of a reasonable time limitation in *Bethel* and the *Grad* plurality's recognition that newly discovered evidence may be found in the wake of a post-trial significant change in the state of scientific knowledge, one is left wondering what due or reasonable diligence even means. If we were truly able to consider the point, we might find that Myers failed to act with reasonable diligence, having waited so many years after Y-STR testing became available. However, given the state of the law, we apparently must presume he acted with reasonable diligence because Y-STR testing did not exist at the time of trial.

### D. Materiality

{¶ 96} Under the fourth *Petro* factor, the question is whether the alleged newly discovered evidence is "material to the issues." *Petro*, 148 Ohio St. at 505. Though *Petro* established this factor, it did not discuss or define it.

{¶ 97} We have said that "[m]aterial evidence is evidence which goes to the substantial matters in dispute or has a legitimate and effective influence or bearing on the decision in the case." *State v. Taylor*, 2011-Ohio-2563, ¶ 18 (2d Dist.), citing *Black's Law Dictionary* (4th Ed. 1968). In the context of materiality, both parties and the trial court cite the United States Supreme Court's decision in *Wearry v. Cain*, 577 U.S. 385 (2016), that "[e]vidence qualifies as material when there is '"any reasonable likelihood"' it could have '"affected the judgment of the jury."'" *Id.* at 392, quoting *Giglio v. United States*, 405 U.S. 150, 154 (1972), quoting *Napue v. Illinois*, 360 U.S. 264, 271 (1959). However, this definition

is drawn from the application of materiality in the context of a claim that the state improperly withheld evidence under *Brady*. *Id*. at 391. No such claim exists here.

{¶ 98} In *Wearry*, the court further remarked that for the defendant to prevail on his *Brady* claim, he "need not show that he 'more likely than not' would have been acquitted had the new evidence been admitted. . . . He must show only that the new evidence is sufficient to 'undermine confidence' in the verdict." *Id*. at 392, quoting *Smith v. Cain*, 565 U.S. 73, 132 S.Ct. 629-631 (2012). The *Brady* standard involves a lesser burden than the standard required to grant a new trial, which is "whether the newly discovered evidence would create a strong probability of a different result at trial." *Martin*, 43 Ohio App.3d at 90. *See also Petro* at 505.

{¶ 99} This makes sense because defendants moving for new trials based on *Brady* violations do not even need to show they acted with reasonable diligence. *Bethel*, 2022-Ohio-783, at ¶ 25. *See also id.* at ¶ 19, quoting *Kyles v. Whitley*, 514 U.S. 419, 433 (1995), quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985) (*Brady* requires only a """reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."""). There is a significant difference between a "reasonable probability" and a "strong probability." The case before us does not involve *Brady* violations.

{¶ 100} *Wearry* has been cited in Ohio only a few times since it was decided in 2016. In one case, the court found no *Brady* violation and rejected the defendant's argument that *Wearry* should apply in how the evidence was analyzed. The court instead applied "the abuse of discretion standard for newly discovered evidence rather than the elevated standard for a *Brady* violation," which is de novo review. *State v. Allen*, 2016-Ohio-7045, ¶ 11, 20, fn. 3 (8th Dist.). In *State v. Hill*, 2019-Ohio-365 (1st Dist.), the First District Court of

Appeals held that the trial court should have held a hearing on the defendant's motion for leave due to the defendant's *Brady* claim alleging a failure by the State to disclose a police report. As we have observed here, the court noted the difference in the reasonable and strong probability standards that apply based on whether a *Brady* claim is involved. *Id*. at ¶ 78-79. The First District employed a similar approach in *State v. Campbell*, 2019-Ohio-3142, ¶ 43, 46 (1st Dist.).

{¶ 101} The two remaining cases citing *Wearry* are *State v. Wilburn*, 2023-Ohio-4865, ¶ 34-43 (4th Dist.)—which was a direct appeal and did not involve a *Brady* violation—and *State v. Riley*, 2017-Ohio-5819 (4th Dist.)—which involved a *Brady* claim alleging that the prosecution failed to disclose impeachment evidence before the defendant pleaded guilty. In *Riley*, the court of appeals found no merit to the defendant's claims that he was deprived of a fair trial or that his plea was involuntary. *Id*. at ¶ 13-30.

{¶ 102} In light of the above discussion, we find that the definition we have previously used for materiality of evidence is appropriate, rather than the standard the trial court used.

{¶ 103} Turning to the new trial decision, the court did not discuss materiality in detail after citing the standard it would use. Instead, although conceding that new DNA evidence does not necessarily result in a new trial, the court found Myers was excluded as the source of the new DNA evidence, which "would clearly have given the defense additional factual support for the theory that another perpetrator was culpable." New Trial Judgment, p. 23-24. Again, this is not the standard.

{¶ 104} In responding, the State contends the court erred in concluding that the DNA on the rock and the spike unequivocally excluded Myers as the source. In this regard, the State stresses that the amount of DNA on the rock and the spike were insufficient to support

any conclusions, and that even if the amount were sufficient to draw conclusions, it did not support a theory that another male committed the offense and that Myers was not present.

{¶ 105} The State further notes that no testing was able to identify the identity of the people whose DNA was on these items or when it was deposited. The State emphasizes that the items have been handled by multiple people and have been stored in multiple locations over the past 40 years, and that DNA could have been deposited by persons not associated with the murder. For the reasons stated below in connection with analysis of the first *Petro* factor, we agree with the State's position. We also disagree with the trial court for the reasons explained below.

E. Cumulative or Impeaching Effect

{¶ 106} The fifth and six *Petro* factors, respectively, ask whether the new evidence "is not merely cumulative to former evidence" and "does not merely impeach or contradict the former evidence." *Petro*, 148 Ohio St. at 505.

1. Cumulative Evidence

{¶ 107} In considering the issue of cumulative evidence, the trial court focused on the DNA evidence only and found that it was not cumulative. New Trial Judgment, p. 24.

{¶ 108} "'Cumulative evidence' is additional evidence of the same kind to the same point. Therefore, where evidence offered on a motion for new trial is merely additional upon the same point upon which evidence was given by the party at the trial, such evidence will be rejected as cumulative." *Kroger v. Ryan*, 83 Ohio St. 299 (1911), syllabus.

{¶ 109} On this point, we agree with the trial court. The DNA evidence concerning the rock and the spike is not cumulative because testing of these items did not occur before trial, except that BCI lab analyst Michelle Yezzo analyzed the spike generally and analyzed the

43

rocks for semen, which she did not find. No further evidence regarding the presence of DNA on these items was presented at trial. Tr. 1462, 1465, 1534, 1590, 1592.

## 2. Impeaching evidence

{¶ 110} In assessing whether the evidence presented by Myers constituted mere impeachment evidence, the trial court found that the DNA evidence impeached the DQ Alpha test results obtained from the foreign pubic hair found on the victim. The court reasoned further that the new testing "could be considered to have more evidentiary weight because new tests are performed at many more loci" than DQ Alpha, which used a single loci. New Trial Judgment, p. 25.

{¶ 111} This analysis was incorrect. In *Martin*, which involved a new trial motion, we stated:

> While *Petro* stands for the proposition that newly discovered evidence that *merely* impeaches or contradicts other evidence is not enough for a new trial, we do not read *Petro* as establishing a *per se* rule excluding newly discovered evidence as a basis for a new trial simply because that evidence is in the nature of impeaching or contradicting evidence. The test is whether the newly discovered evidence would create a strong probability of a different result at trial, or whether it is merely impeaching or contradicting evidence that is insufficient to create a strong probability of a different result.

(Emphasis in original.) *Martin*, 43 Ohio App.3d at 90.

{¶ 112} DNA evidence about the rock and the spike (the only issues for the new trial motion) has nothing to do with analysis of a separate object, the foreign pubic hair. Furthermore, the court's view that the newly discovered DNA evidence might have greater weight in a potential retrial than the DQ Alpha results for a separate and unrelated item is

different from concluding that the new DNA evidence would create a strong probability of a different result. The court compared the DNA testing results of distinctly separate items, which is not the appropriate analysis.

{¶ 113} The court's analysis further indicates its belief that the new DNA evidence impeached other aspects of the State's case, but again, its analysis is both incomplete and incorrect. The court began by stating that the "new DNA evidence establishes a strong rebuttal to virtually every facet of the state's case." New Trial Judgment, p. 25. As an example, the court noted the testimony of David Tincher, who testified about incriminating statements Myers made in jail shortly after the murder. While conceding that the new evidence did not directly impact this witness, the court posed what it called "crucial questions" for Tincher, such as: "If Tincher is to be thought credible, how does he explain the absence of DNA on the rock and the spike?" *Id.*

{¶ 114} This is a question that would never be asked of a fact witness like Tincher. He was not an expert who had any knowledge of DNA; he was a lay factual witness simply testifying about a conversation that occurred in jail while he and Myers were in the same cellblock. *See* Evid.R. 701 ("If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue"). "The distinction between lay and expert-witness opinion testimony is that lay testimony results from a process of reasoning familiar in everyday life, while expert testimony results from a process of reasoning that only specialists in the field can master." *State v. Lavender*, 2019-Ohio-5352, ¶ 95 (1st Dist.), citing *State v. McKee*, 91 Ohio St.3d 292, 297, fn. 2 (2001).

There may be situations where a lay witness can testify in an expert capacity; this is certainly not one.

{¶ 115} Tincher's testimony reveals that he was previously acquainted with Myers. On August 19, 1988, a few weeks after the murder, Tincher spoke with Xenia Police Department ("Xenia PD") Detective Green, and related several things Myers said to him while they were working out together in jail. According to Tincher, he and Myers were talking about sexual things they had done with "girls," and during that conversation, Myers said, "They couldn't get me on a rape." Myers also asked Tincher if he had ever put three rocks in a girl. When Tincher said no, Myers said, "Well, he had." Tr. 1088 1178-1179, 1458, 1730, 1738-1739, 1742, 1746-1747.

{¶ 116} A few days after that conversation, Tincher asked Myers, "Why a spike?" He asked about this because his curiosity was aroused. Myers responded, "Because it was handy." Tr. 1749. Tincher further testified, "After that, he [Myers] said, don't ever try to drive nothing through nobody's forehead. He said, it won't go, but he said it went through the temple." Tr. 1749-1750. Again, this was simply testimony about statements Myers made. Tincher would have no ability, nor any obligation, to explain the absence of Myers' DNA on any objects at the crime scene.

{¶ 117} In considering the issue of impeachment, the court concluded that DNA evidence about the rock and spike would strongly rebut virtually "every other facet" of the State's case. New Trial Judgment, p. 25. However, the court mentioned only a few witnesses. As a preliminary point, the court's statement is overbroad. The testimony of many or most witnesses would be unaffected.

{¶ 118} The trial court referenced expert witnesses Larry Dehus and Richard Bisbing (who had testified about the foreign pubic hair), as well as Dr. Michael Badin (who had

46

testified about gastric emptying). The court wondered how these experts would reconcile their conclusions with the DNA evidence excluding Myers. New Trial Judgment, p. 25. These matters, however, are unrelated. The testimony about gastric emptying at trial related to determining the potential time of death, not to DNA or the spike or the rock. Tr. 1364, 2145, 2164, 2189-2197. Furthermore, Dehus and Bisbing examined the pubic hair microscopically; they did no DNA analysis, and there was no indication they were qualified to express opinions on DNA matters. Tr. 1705-1706, 1851-1854, 1858-1859, 2081-2082, 2092-2098.

{¶ 119} "An 'expert witness' is defined as one who is 'qualified by knowledge, skill, experience, training, or education to provide a scientific, technical, or other specialized opinion about the evidence or a fact issue.'" *State v. Fread*, 2013-Ohio-5206, ¶ 14 (12th Dist.), quoting *Black's Law Dictionary* (8th Ed. 2004). *Accord State v. Armstrong-Carter*, 2021-Ohio-1110, ¶ 88 (2d Dist.). Because Dehus and Bisbing were not qualified as DNA experts, they would not be able to interpret or compare DNA results with their own research. Likewise, Dr. Badin was not an expert on DNA. The trial court was incorrect that DNA evidence would rebut the subject matter of their testimony.

{¶ 120} The trial court's final specific mention of a witness was lay witness Nancy D., who testified about comments an "alternate suspect," Terry Rogers, had made to her about killing Amanda. The trial court believed the DNA evidence from the rock and spike would "bolster Nancy's credibility." New Trial Judgment, p. 26. Nancy testified about a conversation she had with Rogers in 1992, about four years after the murder, during which he made remarks about helping to kill Amanda. Rogers also testified, though, and denied any involvement in the murder or that he had made any such statements. There were also substantial holes in Nancy's testimony, as she recounted a claim that Rogers held the victim's mouth while Gregg Grimes, another "alternate suspect," raped the victim. Tr. 2491,

2495-2499, 2504, 2507-2509. However, Nancy did not mention any rocks, and no evidence of sperm or pubic hair, other than the foreign hair, was ever found.[4]

{¶ 121} It is true that other facts in a case may be used to support witness credibility or deflect attacks on credibility. *E.g., State v. Green*, 90 Ohio St.3d 352, 374 (2000). However, as we discuss below, the amount of DNA obtained from the rock and the spike was too small to provide reliable results. Even if this were otherwise, no other alleged contributors were ever linked to the rock or the spike. Rogers, Grimes, and several other people provided both hair and blood samples to the State. Tr. 2499-2500. The record is silent as to why their samples were not compared to the DNA on the rock. The record is also silent about why, before the hearing, the DNA results for the samples from the rock and the spike were not uploaded into CODIS, where actual alternate suspects could have been located if they existed. CODIS is a national database which "contains DNA profiles of convicted felons and crime scene evidence and is used as an investigative tool to identify suspects by comparing DNA profiles." *United States v. Davis*, 602 F.Supp.2d 658, 660, fn. 1, 666 (D.Md. 2009).

{¶ 122} In any event, because the DNA contributors to the samples from the rock and the spike are unknown, it is hard to see what relevance the DNA results of these samples would have to Nancy's testimony. If DNA consistent with Grimes or Rogers had been found, that might have been different. We find the trial court's "rebuttal remarks" inaccurate with

---

4. The defense team found a hair on Amanda's shirt in 1995 while viewing evidence at the police station, but the hair was never tested for DNA, nor did the defense ask for it to be so tested. Tr. 1632, 1703-1706, 3159-3165. By that time, the shirt had been in evidence for many years and had been examined a number of times—reinforcing the fact that additional biological material can be deposited on evidence items. It is highly unlikely that this hair would not have been discovered when the shirt came into evidence the first time.

48

respect to the witnesses identified by the court. Notably, the court failed to consider all the testimony, which was the relevant method of analyzing the issue.

## F. Strong Probability of Change in the Result

{¶ 123} The last factor the trial court considered was the first *Petro* factor, which is whether the "newly discovered" evidence "discloses a strong probability that it will change the result if a new trial is granted." *Petro*, 148 Ohio St. at 505. The trial court found this to be the case. New Trial Judgment, p. 26-28. However, the court's legal analysis relied on overbroad and incorrect legal assumptions and an incomplete comparison. In analyzing this issue, we begin with the court's first point that the new DNA evidence bolstered the credibility of Myers' claim that he was not at the scene of the crime.

### 1. New DNA Evidence and Myers' Claim That He Was Not at the Scene

{¶ 124} The court first found that "the new evidence clearly supports the Defendant's trial defense that another committed the offense and that the Defendant was not present. The DNA evidence makes this exponentially more credible." *Id*. at p. 26. As we discuss below, the new evidence fails to prove that Myers was not present at the crime scene. Even if we accepted that the evidence was accurate, which we do not, all it established is that at some unknown point, other unknown individuals' DNA could have gotten on the rock and the spike.

{¶ 125} Regarding the new DNA evidence's capacity to connect someone to the crime scene, several points are in order. In the first place, Amanda's body was found in a rocky, stony area down by an abandoned railroad, near the track or railroad bed. A path went through the area, which many people had used as a shortcut for many years. Tr. 1609, 2926-2927, 3981. The railroad tracks were not operative at the time of the murder and were being lifted. As a result, thousands of uprooted railroad spikes were littered up and down the

49

course of the railroad line. Spikes were also scattered around the scene where Amanda was found; there was a rock bed where the tracks had been laid; and rocks were beside Amanda's face. Tr. 854, 875-876, 904, 1091-1092. Due to the amount of foot traffic in the area, any number of people could have picked up or touched the railroad spike or rocks before the murder.

{¶ 126} Male DNA could also have been deposited on the spike by officers at the scene or by medical personnel who examined Amanda's head, as well as the spike, at the scene and by those who performed medical procedures there and on the way to the hospital. Tr. 1040-1045, 2210, 3278. Amanda was treated at a local hospital before an attempt was made to airlift her to another hospital, where she died during the flight. While at the local hospital, personnel did various medical procedures, including placing an endotracheal tube, IV drip, and leads for an electrocardiogram; ventilating and suctioning the tube; and taking chest and x-rays of the body, including the head and skull. Tr. 1082-1083, 2164-2165, 2198, 3257, 3271, 3275.

{¶ 127} DNA could have also been deposited by other individuals who handled the evidence. For example, during the autopsy, though forceps were used to remove the rocks from the victim and gloves were worn, there is no indication that masks were also worn. Tr. 1334. BCI agent Robert Setzer said that he, Dr. Mannarino, and others had handled the spike. Setzer collected most of the physical evidence and did not wear a mask at any time. Tr. 1462, 1551, 1562. And as with the hair found years later on Amanda's shirt, biological material can be deposited on evidence no matter how careful the procedures.

{¶ 128} DNA can be transferred onto objects by "primary transfer, secondary transfer, or aerosolization." *State v. Dawson*, 340 Conn. 136, 153-154 (2021). "Primary or 'touch' transfer occurs, for example, when one directly touches or picks up an object. Secondary

50

transfer occurs when, for example, person A bleeds onto a table and, subsequently, person B walks by the table, accidentally brushes against it, and then sits in a chair. Person A's blood can potentially be on that chair via secondary transfer, although person A personally never came into contact with the chair. Finally, skin cells can be deposited on an object through aerosolization, which . . . occurs when, for example, a person speaks, breathes, coughs, or sneezes on or near an item." *Id.*

{¶ 129} As indicated at the trial here, testing can also contaminate DNA, and that did occur, in fact, when Dr. Blake tested the foreign pubic hair found on the victim. Even at that time, concerns about contamination were well-known in the forensic community. Tr. 2833, 2836, 2849. In fact, defense expert Dr. Gerdes testified that contamination and transference of DNA can occur both at crime scenes and at laboratories even if the person collecting or testing evidence is wearing gloves. Tr. 2814-2815. During the new trial hearing, experts also noted that DNA can be transferred and can result in contamination quite easily. New Trial Tr. 521-522. The presence of unknown male DNA on the spike and the rock does not make Myers' defense theory "exponentially more credible." New Trial Judgment, p. 26.

2. New DNA Evidence and the State's Circumstantial Evidence

{¶ 130} The trial court's second point in its *Petro* analysis was that without DNA evidence, the trial verdict was based only on circumstantial evidence, and the "new" DNA evidence would directly contradict the State's circumstantial evidence. New Trial Judgment, p. 26. We disagree. First, the court could not eliminate evidence from the prior trial; it was required to consider *all* the evidence from that trial. Second, the newly discovered DNA evidence does not "contradict" the prior evidence; it is DNA evidence from items that do not relate to the only other such evidence presented at trial—the results obtained from the foreign pubic hair. As we have stressed, the new evidence does not implicate Myers'

51

suggested alternate subjects. And finally, the trial court's remarks about circumstantial evidence are legally incorrect or, at the least, confusing.

**{¶ 131}** The court stated:

Second, without the new DNA evidence, the Defendant's evidence was – like the State's evidence – circumstantial. The new DNA evidence would be presented as direct evidence to contradict the State's evidence. While direct evidence and circumstantial evidence are a worthy basis upon which to base a conviction (4 OJR-CR 409.01), the tactical argument that direct evidence is more reliable (i.e., less susceptible to subjective bias and human interpretation), is hard to refute.

New Trial Judgment, p. 26.

**{¶ 132}** Under Ohio law, "'[p]roof of guilt may be made by circumstantial evidence as well as by real evidence and direct or testimonial evidence, or any combination of these three classes of evidence. All three classes have equal probative value, and circumstantial evidence has no less value than the others.'" *State v. Nicely*, 39 Ohio St.3d 147, 151 (1998), quoting 1A Wigmore, *Evidence* § 24 et. seq., at 944 (Tillers Rev.1983). *See also State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph one of the syllabus (noting "[c]ircumstantial evidence and direct evidence inherently possess the same probative value"). *Accord State v. Mobley*, 2008-Ohio-4641, ¶ 29 (2d Dist.). "Furthermore, 'direct evidence of a fact is not required, and circumstantial evidence may be more certain, satisfying, and persuasive than direct evidence.'" *Mobley* at ¶ 29, quoting *State v. Jackson*, 57 Ohio St.3d 29, 38 (1991). That is not true in every case, obviously. In some situations, circumstantial evidence might be more persuasive; in others, it might not.

52

**{¶ 133}** Contrary to the trial court's characterization, the State's evidence at trial was not merely circumstantial; direct evidence was also presented. "Direct evidence is where someone actually sees something or hears something and can come into court and positively state what he actually sees or hears and makes a statement in regard to it." *State v. Corkran*, 3 Ohio St.2d 125, 131 (1965) (approving jury instructions to that effect). Direct evidence has also been defined as "'evidence that is based on personal knowledge or observation and that, if true, proves a fact without inference or presumption.'" *State v. Cornett*, 2009-Ohio-3531, ¶ 12 (3d Dist.), quoting *Black's Law Dictionary* (8th Ed. 2004)

**{¶ 134}** An example is testimony of a witness who saw or heard a defendant do something. *E.g., State v. Hilleary*, 2015-Ohio-2782, ¶ 21-22 (2d Dist.) (no direct evidence existed that a witness saw defendant illegally dump tires, but circumstantial evidence established his guilt). Direct evidence may also include a defendant's own statements made to others, given to the police, or stated at trial. *E.g., State v. Pappas*, 2001 WL 1597990, *5 (2d Dist. Dec. 14, 2001) (discussing that defendant's testimony was the only "direct evidence" presented at trial).

**{¶ 135}** Multiple witnesses testified at Myers' trial about what they had directly heard or seen or done. The subjects of their testimony included, but were not limited to, collection of evidence from the crime scene and from Myers' automobile; medical treatment rendered at the scene and at the hospital; statements Myers made before and after the crime; observations of Myers' and Amanda's actions the night of the crime; Amanda's autopsy; and photographic documentation of the investigation.

**{¶ 136}** "[C]ircumstantial evidence is defined as '[t]estimony not based on actual personal knowledge or observation of the facts in controversy, but of other facts from which deductions are drawn, showing indirectly the facts sought to be proved.'" *Nicely*, 39 Ohio

St.3d at 150, quoting *Black's Law Dictionary* (5th Ed. 1979). As an example, gunshot residue test results may be circumstantial evidence that the person from whom the sample was obtained shot a gun. *State v. Carson*, 2018-Ohio-271, ¶ 36 (8th Dist.). *See also St. Paul Fire & Marine Ins. Co. v. Baltimore & Ohio RR. Co.*, 129 Ohio St. 401, 405, 408 (1935) (describing experiments conducted about cause of fire as circumstantial); *State v. Combs*, 100 Ohio App.3d 90, 101 (1st Dist. 1994) (blood tests and alcohol bottles may have been circumstantial evidence of defendant's intoxication); *State v. Gibson*, 2007-Ohio-3345, ¶ 7 (3d Dist.) ("DNA report for the blood droplets constitutes circumstantial evidence"). In any event, whether DNA tests are circumstantial or direct evidence, the trial court was incorrect when it said the DNA evidence contradicted the evidence at trial.

**{¶ 137}** As an additional matter, contrary to the trial court's implication about the greater validity of "direct" evidence such as scientific analysis, such evidence can involve some degree of subjectivity. This was noted at the trial by both State and defense experts. *See* Tr. 1573, 1578-1579 (Michelle Yezzo, BCI forensic scientist); Tr. 2145, 2262-2263 (Dr. Michael Badin, forensic pathologist); Tr. 2801, 2895-2896, 2917 (Dr. John Gerdes, defense DNA expert); Tr. 3283, 3304-3305, 3316-3317 (Dr. Phillip Hartman, State rebuttal DNA expert).

**{¶ 138}** Testimony at the new trial hearing also revealed some degree of subjectivity as well. Labs use different analytical thresholds and different criteria for comparing DNA; labs create their own standard operating procedures ("SOPs") and guidelines; and expert opinions can be affected by cognitive or contextual bias (e.g., when scientists let investigative material they have read affect their opinions). *See* New Trial Tr. 23, 70, 72-77, 124, 127-128 (Megan Clement, defense forensic scientist); New Trial Tr. 40-241, 250, 266, 275, 298, 307 (George Shipiro, defense DNA expert); New Trial Tr. 402, 407-410, 418-419,

424-425, 462-463 (Dr. Maria Cuellar, defense expert on forensic statistics); New Trial Tr. 638-639, 689 (Dr. Katherine Maloney, defense expert on forensic pathology); and New Trial Tr. 746-748, 780, 811-812 (Lewis Maddox, State DNA expert).

{¶ 139} None of this means that scientific testing is any less valid than other types of evidence. However, it can be so where, as here, the sample being tested is degraded or is of extremely small quantity, or testing yields questionable results due to amplification of the sample or lowering standards.

### 3. New DNA Evidence and the Credibility of the Defense's Trial Witnesses

{¶ 140} Returning to the new trial decision, the trial court made a third point in considering the last *Petro* factor. The trial court also found—without discussing specific evidence from the trial—that Myers' "newly discovered" evidence bolstered the testimony of every defense witness who had attempted to convince the jury that other perpetrators had motive and opportunity to commit the murder. The trial court stated that "[e]very defense witness would certainly have been perceived as more credible, especially those who established an alibi and those who indicated other possible perpetrators were seen in the vicinity at the appropriate time." New Trial Judgment, p. 27.

{¶ 141} The DNA evidence would not have bolstered anyone's credibility. There was no evidence that the alleged perpetrators' DNA was on either the rock or the spike or that the defense had tried to compare the DNA to that of the alleged perpetrators or anyone else. We note that DNA samples from these individuals appear to exist, as their samples and samples from others were listed on the evidence Myers asked the trial court to order preserved in 1999, a request which the court granted. *See* Appendix to Relief Petition (June 21, 2022), Ex. 16, Item #61 (items in possession of State). In 2020, a sample of the blood of Glenn Smith, Amanda's boyfriend, was provided to a private company for DNA

55

testing, and a Y-STR profile was obtained. Appendix to Amended Motion for New Trial (Feb. 28, 2024) ("2024 Appx."), Ex. 4 (Supplemental DNA Case Report), p. 1, 3.

{¶ 142} Notably, Myers' Relief Petition stated that the State was searching for oral, vaginal, and rectal swabs recovered from the victim and that Myers was not waiving his right to seek testing on these items. *See* David Lee Myers Petition to Vacate Death Sentence Pursuant to R.C. 2953.21 and R.C. 2953.23 (June 21, 2022), p. 59, fn. 18. One would assume that if the DNA of alternate subjects had been lost or was unavailable for testing, Myers would have mentioned this. As we said, Myers failed to raise the issue. A possibility is that this evidence would "exclude" these others as well as Myers.

{¶ 143} Furthermore, the credibility of the testimony of fact witnesses would depend on their own testimony about what they saw or heard, not on what experts might say on unrelated matters. The "newly discovered" DNA evidence would also not affect the forensic experts who testified about the pubic hair because most were not DNA experts, and the presence or absence on DNA on different evidence would not impact their testimony. An exception might be Dr. Blake, who conducted DNA analysis on the pubic hair for the State. However, there is no indication in the record whether the doctor is still alive, given that the trial occurred around 30 years ago. If he is no longer alive, the most that could be done on retrial would be to read his former testimony at a new trial, in which case no further questions could be asked. It is also impossible to conclude what the doctor might say on retrial about DNA. The trial court's conclusions regarding the probative weight of the new DNA evidence were only speculation.

{¶ 144} The court did not discuss any specific defense witness. Myers presented the following witnesses at trial: Sergeant Linkhart, who had been the chief investigating officer on the case in 1990; Terry Rogers, one of the alleged alternate suspects; Gregg Grimes,

56

another of the alternate suspects; Nancy D., an acquaintance of Rogers and Kim Grimes; Enid T., whose daughter lived near the crime scene; Larry G., with whom Gregg Grimes' wife, Kim, was staying with occasionally at the time of the murder; Deanna G., Larry's wife; Claude Lyons, a Greene County police lieutenant in charge of road patrol; Julia G., one of two girls who discovered Amanda's body; Tami P., an investigator who assisted Myers' defense team; Dr. John Gerdes, a DNA expert; Debra B., who lived near the crime scene; Pauline R. and her husband, Robert, who owned a bar and apartments in Xenia; Robert M., an orthopedic technologist; Detective Young, a Columbus police officer; John Bodovetz, a private investigator for the defense; Jeff Moore, an attorney who had represented Myers; and Freda C., Myers' sister.

### a. Linkhart

{¶ 145} At the time of the murder, then-Detective Linkhart was the investigating officer for the burglary of Larry and Deanna's house on Locust Street. He was the officer who interviewed Gregg Grimes on August 4, 1988. Linkhart discussed the interview and some later interactions with Grimes. Linkhart testified about his attempts to locate and serve Kim Grimes with a subpoena, which were unsuccessful, and his limited contacts with Gregg Grimes. Tr. 2479-2489. Linkhart's testimony had nothing to do with DNA evidence or an alibi, and we cannot see how further DNA evidence would impact Linkhart. Tr. 3026-3080.

### b. Nancy

{¶ 146} Nancy D. testified about incriminating statements Terry Rogers allegedly made to her four years after the crime, in which he implicated the involvement of himself and Gregg Grimes in the crime. Nancy waited until the week before her January 29, 1996 testimony, i.e., more than seven years after the crime, before contacting the defense. Tr. 2504-2529, 3138-3153. "New" DNA evidence would not bolster Nancy's credibility

57

because the DNA evidence did not connect either Rogers or Grimes with the crime. Nancy would not be in a position to comment on scientific evidence.

### c. Enid

{¶ 147} Enid testified that she was at her daughter's home in the early morning hours of August 4, 1988. Enid's daughter lived on the corner of West and Locust Streets, which was near the field and railroad tracks where Amanda was murdered. According to Enid, between 12:15 and 12:30 a.m., she saw a black man walk down the street, smoke a cigarette, and then walk across the field. Enid did not know the man. Tr. 2530-2534. This testimony is generally irrelevant, other than to indicate that Gregg Grimes, an African American male, may have been in the vicinity at that time. However, that point is essentially undisputed, as Grimes himself indicated that he was in the area of West and Locust Streets a number of times that night. The house where his ex-wife, Kim, was staying with friends was on Locust Street; Grimes entered the house the night of the murder and destroyed property while Kim and the other occupants were not there. Grimes also hid across the street from that house to wait for Kim to come back. Tr. 909, 1139-1140, 2656, 2752-2753.

{¶ 148} If Enid's testimony were intended to support some sort of "alibi" defense, her observations occurred at least an hour before Officer Rinehart saw Myers and Amanda walking together on Home Avenue. *See* Tr. 878, 877-880, 892-897. Officer Rinehart had been dispatched to the Roundtable bar concerning the matter involving Glenn Smith, Amanda's boyfriend. After Smith was arrested, Rinehart left Roundtable and followed Officer Savage, who was transporting Smith to jail. After Savage got to the jail, Rinehart returned to the area of Roundtable. He then saw Myers and Amanda at 1:35 a.m. at the latest, but more likely 1:30 a.m., walking in a northwesterly direction, which would have been towards the

railroad area. When Reinhart saw them, they were about 300 yards from where Amanda was murdered.

{¶ 149} The trial testimony also indicates that during the timeframe discussed in Enid's testimony, Myers, Amanda, and Smith were still at Five Points Tavern; they had not even yet arrived at Roundtable. Enid's testimony would have had no relevance to an "alibi."

### d. Larry and Deanna

{¶ 150} Larry G., lived on Locust Street with his wife Deanna and their children. His home is the one that Grimes entered and trashed the night of the murder. The house faced the field where Amanda's body was found. Larry's testimony was confined to the events surrounding Grimes' harassment of Kim and Grimes' damaging the property. DNA evidence would have no impact on Larry's credibility, and he offered nothing regarding any purported alibi. Tr. 2535-2591. Larry's wife, Deanna, testified about the same subjects. Tr. 2952-2608.

### e. Lyons

{¶ 151} The defense also presented testimony from Claude Lyons, a lieutenant in charge of the road patrol who had a limited role in the murder investigation. Lyons testified about a newspaper article in which he had commented about police dogs from Beavercreek being at the crime scene. However, he had little recollection about that. Tr. 2611-2620. Any new DNA evidence would have no impact on his credibility or an alibi.

### f. Julia

{¶ 152} Defense witness Julia G. was one of the two teenage girls who discovered Amanda's body around 3:00 a.m. when they were walking through the railroad track area to go home. Julia testified about the events of that evening leading up to discovering the body and then running home to call the police. Tr. 2621-2631. Her testimony would be unaffected by new DNA testimony and is also irrelevant to any potential alibi.

59

## g. Tami

{¶ 153} Defense witness Tami P. was a private investigator who worked for Myers' defense team during the pendency of Myers' first murder case. The subjects of her testimony included interviewing Julia; observing an injury to Myers' ring finger when she visited the jail a few weeks or so after the murder; and seeing an index card from the jail at some point that listed a wallet and money for Glenn Smith, which was contrary to testimony that Smith had left his wallet with Amanda. Tr. 2633-2650. None of Tami's testimony had to do with an alibi, and DNA evidence would have no bearing on her credibility.

## h. Gregg Grimes

{¶ 154} The next defense witness was Gregg Grimes, one of the "alternate suspects." During his testimony, Grimes admitted that he had lied to the police in implicating Terry Rogers in two home invasions on Locust Street the night of the murder (one at Larry's house and another at a nearby house on Locust Street called "Animal House"). Grimes also admitted he had lied to the police about the description of a man he had seen driving a car into the crime scene area before the police arrived and about the man and a girl arguing; the description of the man did not match that of Myers. In that statement, Grimes had also told the police that he had seen the man slam the girl against the car and then leave. At trial, Grimes further testified that after he had trashed Larry's house, he hid outside, waiting for Kim to return. He saw a headlight that he thought was the police looking for him because of the break-in and the aggravated burglary he had committed that night. However, it was not the police. A car came to the railroad area, stopped, and turned its ignition and lights off. Grimes saw someone get out of the car, but he did not give the description that he gave the police; he actually could not describe the person; instead, he had lied and made up the description. However, Grimes stated at trial that a photo of Myers' car looked like the car he

60

had seen, though Grimes had never seen a photo of that car. The person got out of the car, and Grimes thought the person was urinating. The person then got back in the car, peeled out, and went back down West Street. Tr. 2694-2699, 2704-2705, 2724-2725, 2751-2758.

{¶ 155} According to Grimes, he was curious after the car left, so he walked down the tracks, where he saw a woman's body and heard moaning. He did not touch her, but got scared and panicked, as he had just committed two burglaries that night (at Larry's and at the Animal House), had been in the railroad area that night, was a black person, and had been prosecuted by the Greene County prosecutors a number of times. At Larry's house, he had also left a note to his wife, threatening her. The police arrested Grimes the next morning. He was wearing the same clothing he had worn all night. When Grimes was taken in for questioning, he was not concerned about the burglaries; he was concerned about being questioned about the woman on the tracks. As a result, he lied about Rogers' involvement in the burglary of Larry's residence. This was because though Rogers was Grimes' cousin, they did not hang out together, and Rogers had a reputation of being a pretty rough person. Grimes believed that he would be blamed for the burglary, so he thought he had better find someone to blame who could possibly have committed it—Rogers. For the same reason, Grimes lied about the description of the man he had seen. Tr. 2745, 2758-2770.

{¶ 156} During questioning, Grimes was asked about telling his ex-wife, Kim, whom he had a pattern of stalking and harassing, that he had killed Amanda. He told Detective Linkhart that he had said that to control his ex-wife and keep her in line. Grimes admitted at trial that he had made such a statement to his ex-wife and that he may have said it in anger. Grimes denied any involvement in the crime. Tr. 2777-2778, 3041-3042, 3072-3073.

61

**{¶ 157}** Grimes' testimony did not involve Myers' alibi, and in fact, Myers did not specifically rely on an alibi at trial. Instead, his defense was that he had left Amanda at the Roundtable and that alternate suspects, Grimes and Rogers, had committed the murder. The new DNA evidence would be relevant to Grimes if it implicated him or at least was unable to exclude him. However, that did not happen.

**{¶ 158}** The exclusion of Myers' DNA from the rock and the spike, even if credited, does not automatically exclude him from the crime scene. And, of course, Grimes was not included as a contributor to the DNA on the spike and rock. In addition, the police took all the clothing Grimes had worn during all the events on August 3 and 4 when he was arrested the morning of August 4. When tested, Grimes' clothing showed no evidence of blood. Tr. 1100, 1601, 2672.

### i. Dr. Gerdes

**{¶ 159}** Dr. Gerdes testified as a DNA expert. The primary purpose of his testimony was to discuss DNA technology, contamination in testing, and Dr. Blake's analysis of the foreign pubic hair. Dr. Gerdes criticized Dr. Blake for using too many cycles to amplify a small amount of DNA, which increased the effect of a contaminant and caused the results to be scientifically unreliable, the same criticisms made at the new trial hearing. Tr. 2801-2922, and more particularly, 2821-2823, 2832. *See also* New Trial Tr. 528-530, 546, 549-550, 588. Gerdes' testimony covered only DNA testing and results concerning the hair and had no relation to other items. His testimony certainly did not relate to any alibi.

### j. Debra

**{¶ 160}** At the time of the murder, Debra B. lived with her children on a street that was south of the crime scene. Debra's testimony concerned the fact that the girls who discovered Amanda's body, Julia and her friend Jennifer, were at her house in the early

hours of August 4. The girls left at about 3:00 a.m. Debra estimated that earlier in the evening, closer to 35 to 40 minutes after the girls arrived, she had heard the sound of a car on the roadway by the trestle. She heard music but nothing else. The car was there a short time and left. Tr. 2923-2931. DNA evidence of the rock and the spike would have no bearing on this testimony. It is also not relevant to an alibi, as Amanda was seen walking on the street with Myers at around the same time. Even if that were otherwise, one of Myers' stories is that when he left Roundtable, he walked to Five Points. His described route would not have taken him through the railroad area. He also would not, in his account, have driven through the railroad area.

### k. Pauline R. and Robert R.

{¶ 161} This married couple contacted the defense during the trial after reading about trial testimony. Pauline testified that a few days after the murder, she discussed the rocks placed in Amanda's vagina with a law enforcement person, Teresa Madison, who was training to be a deputy and was working at the jail. According to Pauline, Teresa had rented an apartment from Pauline and her husband, Robert, and told Pauline about the rocks when she came to pay rent or pay for a deposit. Pauline then told Robert, and he discussed it with patrons at the bar they owned. Pauline and Robert came forward after reading about trial testimony to the effect that no one knew about the rocks because that information had not been disseminated publicly. Tr. 2933-2948. This information had nothing to do with DNA or an alibi. Notably, Teresa testified on rebuttal that she began work with the Greene County Sheriff's Office on July 7, 1989, and rented an apartment from Pauline and Robert for a short time in the late summer of 1989. Teresa said she could not have had a conversation with them about the Myers case in 1988, as she did not know them before she rented the apartment the following year. Tr. 3207-3209.

63

### l. Robert M.

**{¶ 162}** Robert M. was an orthopedic technologist who assisted surgeons. He worked with Myers' fiancée at Children's Medical Center. Robert had reviewed medical records for an injury Myers had sustained on July 4, 1988, which resulted in an injury to the right ring finger. Though Robert was not a doctor, he opined that Myers would have had great difficulty using his right hand as it pertained to the ring finger. He was surprised that Myers was doing construction work 30 days after his injury. Tr. 2962-2997, particularly 2978, 2988. The DNA evidence would have little or no bearing on Robert's testimony, his credibility, or any alibi.

### m. Terry Rogers

**{¶ 163}** Rogers denied any involvement in any crimes the night of the murder, denied making any incriminating statements to Nancy, and denied any involvement with Grimes in any crimes. He also said he had voluntarily given hair and blood samples to the police. Tr. 2491-2503. We fail to see how DNA evidence about the rock and railroad spike would impact or enhance the testimony of this witness. Rogers' testimony also did not pertain to any alibi.

### n. Young

**{¶ 164}** Detective Young was a police officer who had been employed by the Columbus (Ohio) Police Department since 1970 and had training in blood spatter and bloodstaining analysis. Young had originally been contacted by the defense about blood spatter analysis in 1989 and reviewed a few photos, but he did not finish his investigation. The prosecution subsequently contacted Young in 1995 and provided him with additional information. At trial, Young testified about blood spatter and bloodstains and some preliminary conclusions he had reached, which he retracted after reviewing information he had not previously received. Young's analysis had nothing to do with an alibi or DNA, nor

64

was he qualified as a DNA expert. Any new DNA evidence would not enhance or impact his credibility. Tr. 3081-3131.

### o. Bodovetz

**{¶ 165}** John Bodovetz worked with the defense as a private investigator. He testified about coming to view evidence in January 1995 at the Greene County Sheriff's Office and discovering another hair on Amanda's shirt. Tr. 3153-3165. Bodovetz was simply a fact witness, and there is no reason to find that any new evidence would be relevant to his testimony. Furthermore, this hair was apparently never tested for DNA and was not discussed at the new trial hearing. Tr. 1632, 1703-1706, 3159-3165.

### p. Moore

**{¶ 166}** Moore was an attorney who had represented Myers. He was unsure about the specific dates, but it could have been in 1988; he believed he had also represented Myers in 1989. Moore was the person who contacted Detective Young about blood spatter work. Moore discussed Young's first impression findings and also testified about conversations with Michelle Yezzo, the BCI hair examiner. Tr. 3167-3202. There is no indication that new DNA evidence would have any bearing on Moore's testimony or any relation to an alleged alibi.

### q. Freda C.

**{¶ 167}** The final defense witness was Freda C., Myers' sister. Freda lived in the area with her husband and son. Freda stated that they had been to the Greene County Fair on August 3 and left to go home around 9:30 p.m. As they pulled in the driveway, Myers pulled up, came in, and stayed about half an hour. Freda described the clothing Myers was

wearing, which was a red half-shirt that she disliked. Tr. 3236-3241.[5] DNA evidence would have no relevance to his testimony and would have no bearing on an alibi.

{¶ 168} Given our review of the testimony of the defense witnesses, the trial court's broad statements that the new DNA evidence would enhance credibility of defense witnesses are both inexplicable and unsupported by the facts. The trial court did not discuss most of the testimony before making such a sweeping conclusion.

4. New DNA Evidence and the Credibility of the State's Trial Experts

{¶ 169} The court's final point under its analysis of the first *Petro* factor was that in light of the DNA evidence from the rock and the railroad spike, the State's trial experts (Dehus, Bisbing, Badin, Blake, and Krause) were "significantly less credible." New Trial Judgment, p. 27. The court remarked that these experts "would have reexamined their conclusions in light of the new [DNA] evidence," and "indeed, these experts likely would have been unwilling to express their prior opinions." *Id*. The court went on to say that "[i]t seems reasonable to conclude these witnesses would have possessed no answer as to how the defendant's DNA was not on these instruments of the crime while other male's DNA was on the items." *Id*.

{¶ 170} As with the trial court's conclusion regarding the defense's trial witnesses, the court failed to discuss any specific expert or how any DNA evidence from the rock or the spike would be relevant to that expert's testimony. Here the court again made broad conclusions based on speculation. In discussing this matter, we consider testimony of the experts the court mentioned, although not in detail, as most of their testimony had nothing

---

5. Myers was wearing this shirt the night of the murder; it read "'Lover Boy.'" *Myers I*, 1999 WL 94917, at *24-25.

to do with DNA. Their testimonies also have nothing to do with the matters at issue, which are the DNA from the rock and the spike.

{¶ 171} First, Dr. Krause had been the Greene County Coroner from 1964 to 1990 and was present at Amanda's autopsy. At the time of trial, he had been a member of the American Academy of Forensic Science for 26 or 27 years and was also a fellow in the American Academy of Forensic Science. Krause described what occurred during the autopsy, and related that the cause of death was severe head trauma produced by a penetrating railroad spike and attempted strangulation. Tr. 1307-1372. The trial court failed to explain, nor can we fathom, how DNA evidence from the rock and the spike would cause the doctor to change his opinion about the cause of death or render him unwilling to express his former opinions. The same is true of Larry Dehus. Dehus was a microscopic hair analyst without DNA expertise and was not qualified to express opinions on DNA matters. Tr. 1851-1899.

{¶ 172} Dr. Edward Blake was a forensic serologist who tested the foreign pubic hair using the DQ Alpha technique. This type of testing is not like fingerprints and cannot identify a specific person within a large community. Instead, it is useful in distinguishing persons. Blake compared the foreign pubic hair to the blood and hair of Glenn Smith, Gregg Grimes, Terry Rogers, Amanda, her stepfather, and Myers. Blake found that the sample was not consistent with the other individuals, but that the person who deposited the hair had a DQ alpha genotype of 1.3, 2, which occurred in about two percent of the population. This was a group within which Myers fit. Tr. 1905, 1931-1933, 1937-1941, 1948, 1966, 1973-1974. The point was that Myers could not be excluded from this group. It did not mean that he was the specific person who committed the crime.

{¶ 173} Whether DNA was present on the rock and the spike would be irrelevant to Blake's testimony, which concerned a different item. Furthermore, Blake did discuss a number of items from the crime scene that were tested and excluded Myers. These included a small blood spot on one of Myers' shoes, which did not originate from Amanda's blood; two blood spots on Amanda's pants, which had a DQ Alpha genotype (3, 4) that was consistent with Amanda and from which Myers was excluded; and sperm found on the crotch of Amanda's pants, which matched the genotype of her boyfriend, Glenn Smith. Tr. 1975-1977.

{¶ 174} Dr. Bisbing was a senior microscopist, and like Dehus, his expertise involved hair comparison using microscopes. Tr. 2081-2087. Whether Myers' DNA was present or not on the spike or rock would be irrelevant to Bisbing's testimony. Bisbing would not be able to express an opinion on DNA results on these items, as that was not his area of expertise.

{¶ 175} Finally, Dr. Badin was a pathologist who reviewed hospital and autopsy records of Amanda. He testified about the cause of death; the timing of the initial assault on Amanda based on the time of death; the swelling of her right eye and optic nerve; and the gastric content of her stomach. Tr. 2145, 2157, 2163, 2187-2189. DNA evidence on the rock and the spike would have no relation to this testimony, and beyond making broad conclusory comments, the trial court made no attempt to explain its statements. The court also failed to mention Dr. Hartman, who testified for the State on rebuttal. Hartman was a molecular biologist who had been involved in DNA research since 1975; he reviewed all of Dr. Blake's testing and reports and agreed with Blake's findings on the presence of the 1.3, 2 genotype in the sample from the pubic hair. Tr. 3283, 3285, 3288-3289, 3295-3297, 3306-3311. Even

if the court had mentioned Dr. Hartman, the scope of this expert's testimony was limited to the DNA results obtained from the hair.

{¶ 176} Based on the preceding discussion, we find that the trial court's analysis was fatally flawed because the court did not adequately consider the proper evidence and its conclusions were unsupported. Having rejected the court's analysis, we turn to the proper analysis under *Petro*, which is to compare the DNA results from the rock and the spike with the evidence presented at trial.

### G. Comparison Under *Petro*

### 1. Testimony from New Trial Hearing

{¶ 177} Regarding the issue of the rock and the railroad spike, testimony from the following individuals was presented during the new trial hearing: (1) Kate Roller; (2) Lindsey Sanney; (3) Meghan Clement; (4) George Schiro; (5) Jennifer Bracamontes; and (6) Lewis Maddox.

{¶ 178} Meghan Clement was a forensic biology consultant who has been involved in DNA analysis and testimony for many years. At the end of 2018, an Ohio Public Defender contacted Clement for recommendations on what further testing might be done in Myers' case. Clement issued a report in March 2019, suggesting, among other things, that the rocks in the vagina and the spike be tested. New Trial Tr. 88-89, 103-104. Materials were then sent out for DNA testing.

{¶ 179} Several steps are involved in DNA testing. The first is sampling, which consists of collecting biological material. Next, DNA is extracted from the material by adding chemicals to tubes containing each sample of material. The chemicals break down the cells and allow them to release the DNA from the biological or cellular material. In the next step, quantification, the amount of DNA recovered is estimated. After that, amplification occurs.

In this part of the process, millions of copies of specific segments of the DNA originally extracted are generated. CE or capillary electrophoresis is also used, which takes part of the amplified DNA and loads it onto instruments that separate parts of the DNA fragments by size. Amplification basically xeroxes each area of DNA that will ultimately be used to create a profile. The final step is interpretation and preparing reports. When scientists analyze the output, they look at the DNA profile for each item. This was the process used for the rocks and the railroad spike. New Trial Tr. 59, 131, 296-297, 304-307.

{¶ 180} When amplification is occurring and DNA is being copied, a fluorescent dye is attached so segments can be identified further down the line. A genetic analyzer with long capillary lines is used in this process. The analyzer draws some of the sample with DNA on it, and the DNA moves through a long capillary tube. Smaller fragments move more quickly than larger ones. As the fragments come off the capillary, a laser excites the fluorescent dye. The instrument's software captures how fluorescent, or how extreme the fluorescence is, and charts it on a graph. An electropherogram is developed from the data, which is what is ultimately interpreted in connection with the testing. An electropherogram is like an EKG printout and is reviewed to see if peaks are present. If the peaks are high enough, they can be assigned allelic values. New Trial Tr. 68-69, 252-253.

{¶ 181} Each gene has two alleles, and each parent contributes one. An allele represents a characteristic or trait. RFU stands for relative fluorescent units and captures how high or strong a peak is and how much fluorescence is detected when it comes off a genetic analyzer. It is the measurement of a peak. Smaller fragments of DNA pass through the instrument faster than larger pieces of DNA. If a small amount of DNA exists, there will be a smaller RFU, while a larger quantity emits more light, yielding more data. New Trial Tr. 83, 771-772.

70

**{¶ 182}** "The DNA fragments examined in this process originate at loci that contain short, repeating sequences of genetic code called short tandem repeats ('STR'). The number of repetitions tends to vary from person to person, which causes the length of these DNA fragments also to vary in ways that can be used to distinguish different individuals. At each locus there are several possible lengths that the fragments might have. Each possible length variant is called an allele. The alleles are identified by numbers that correspond to the number of 'repeats' in the STR. For example, a fragment containing eleven repetitions of a short sequence of genetic code will be labeled 'allele 11.'" (Footnote omitted.) *United States v. Lewis*, 442 F.Supp.3d 1122, 1136 (D.Minn. 2020). "At each locus a person generally inherits two of these alleles, one from each parent. For a given individual, the same pair of alleles will be found at that locus in the DNA of all his nucleated cells and remains consistent throughout his lifetime. Different individuals tend to have different alleles. While two people may, by chance, have the same alleles at a few loci, the chances of such a coincidence diminish rapidly as more loci are examined. The set of alleles that a person has across multiple loci is called a multi-locus genotype or a DNA profile." (Footnote omitted.) *Id*.

**{¶ 183}** "The electropherograms display a set of peaks that signal the presence of alleles. The position of a peak along the graph indicates the length of the amplified DNA fragments containing an STR." *Id*. "The height of each peak corresponds roughly to the quantity of DNA detected – taller peaks indicate more DNA." *Id*. at 1137. *See also* New Trial Tr. 359.

**{¶ 184}** Risks exist in the amplification process. If a small contaminant is introduced, it will be replicated along with the DNA. Another issue is that where there are small quantities of DNA or the DNA is highly degraded, preferential amplification can occur. In this situation,

71

during the replication part of the process, one allele will copy better than another. That is, one allele may show at a reportable standard, and another may show as not reportable or not show at all. "Stutter" can also occur during amplification and can cause an allele to appear at more than one position or as an elevated peak. Stutter can usually be filtered out, but it may not be in lower-level samples. New Trial Tr. 67, 141-142, 272, 261-362. Bearing in mind this background, we consider evidence at the new trial hearing pertinent to the rocks discovered in the victim's vagina.

### a. Testimony About the Rocks

{¶ 185} Kate Roller was a senior DNA analyst at Bode Technology ("Bode"). In July 2020, the Federal Public Defender sent Bode evidence for testing, including fingernail scrapings for the victim and an "alternate male subject" and three rocks recovered inside the victim labeled "E04A," "E04B," and "E04C" (hereafter, "rock A," "rock B," and "rock C"). Initially, Bode did just a screening for potential male DNA. No male DNA was found on the victim's fingernail scrapings, and male DNA was found on the male scrapings; further STR testing for the latter item generated a partial DNA profile consistent with one male contributor. However, Bode was not provided a reference sample for comparison to this item, and no further testing was done. New Trial Tr. 191, 199, 204-209.

{¶ 186} Concerning the rocks, no male DNA was found on rock B, and the other two rocks were inconclusive. As a result, Y-STR testing was done on rocks A and C. After that testing, no Y-STR profile (male) was obtained from rock C, but a partial Y-STR profile was obtained from rock A. Even if a reference sample had been provided, Bode would not have been able to make a comparison due to limited data. The information that was revealed did not meet Bode's SOPs, which required individuals to be located at five different locations in

order for a comparison to be made. Bode, therefore, reported its test results as "no conclusions." New Trial Tr. 210-215, 221-222.

{¶ 187} Although the defense asked Bode to re-examine the matter, Bode refused. Bode had three thresholds for Y-STR testing. The first was the "peak detection" threshold, which is the threshold at which, based on Bode's validation studies, Bode was confident calling a result a "peak" and not background noise. Such noise is analogous to the static that occurs when an FM radio is being tuned. Bode's threshold for peak detection was 35 RFU, and the result from rock A was 25 RFU, which was below Bode's threshold. New Trial Tr. 221-222, 256.

{¶ 188} The second threshold was an "an analytical threshold," which represents the point where Bode allowed a result to have an allele designation. Bode's threshold for that was 75 RFU. The third threshold Bode used was a stochastic threshold, which was 300 RFU for the kit Bode used. Stochastic effects refer to random events that can occur with low-level DNA and with mixtures. The male DNA on rock A was low level, i.e., a very small amount; it was classified as less than 0.001 nanograms, rounded to .00 nanograms. It consisted of a few to minimal cells. The BCI, in contrast, targets one nanogram of DNA for testing. New Trial Tr. 128, 137, 222, 225-226, 765, 768, 777-789.

{¶ 189} Deviating from the rocks for a moment, and relative to Meghan Clement's testimony, another senior DNA analyst at Bode, Lindsey Sanney, tested five samples from Amanda's jeans, three samples from Amanda's shirt, and the railroad spike. Regarding the shirt and jeans, either no male DNA was found or Y-STR testing revealed a mixture too complex to allow conclusions. Concerning the spike, the offset head and an area below the offset head were tested and labeled as E07-A-1 and E07-B, respectively. As to the offset head, Y-STR testing revealed a partial Y-STR profile consistent with a mixture of at least

73

two individuals. However, due to the possibility of allele dropout, no conclusions could be made. Allele dropout means information is missing or is dropping out of the profile, so the data is limited and no conclusions can be made. Regarding the area below the offset, STR and Y-STR tests were done. The STR test revealed a major female contributor and a minor male contributor. The Y-STR test indicated a partial Y-STR profile, with a mixture of at least two individuals. Again, no conclusions could be drawn due to the possibility of allele dropout. Notably, a technician had swabbed the spike, and the inventory notes given to Sanney did not indicate if the area swabbed was literally just underneath the head or if the entire spike below the head had been swabbed. Therefore, Sanney was unclear whether the swabbed area included the rest of the spike or just a certain area below the head. New Trial Tr. 288, 294-311.

{¶ 190} Clement reviewed Bode's test results and issued a report on December 8, 2021. Clement was not comfortable expressing opinions on anything other than rock A. Based on only 6 alleles that Bode found out of the 23 tested using its program (PowerPlex 723), Clement concluded that she could express an opinion about the rock. She determined that Myers could be excluded as a contributor because his allele was different from those found at five of the six locations. One of Myers' alleles matched, but Clement discounted that because it was not uncommon for two unrelated males to possess the same allele at any number of these locations. Clement further explained that she had seen instances of two unrelated males matching at 7 or 12 different locations, but the entirety of the profile has to be considered. And, looking at the entirety of the profile, all it took was one difference to exclude someone from the evidence. New Trial Tr. 108-110, 121-122, 124-125, 133, 224; 2024 Appx., Ex. 2-B.

{¶ 191} In light of Clement's testimony, however, real questions exist about the validity of the interpretation of DNA results, including hers, because there are no uniform standards, and labs and individuals differ about the acceptable amount of data needed for interpretation. In contrast to Clement, Bode did not find the results sufficient for interpretation. Clement admitted that different labs have different peak thresholds and different analytical thresholds, and no one dictates what peak or analytical thresholds they must use. Labs also use different equipment and different commercial kits, and variations among individuals exist in pipetting and among the sensitivity of equipment. Additionally, some labs assert that if they are testing 23 locations, they must get results in at least half to interpret the data; others state they need at least five locations; and another lab says that a comparison can be made at one location. In contrast, if a partial profile exists, other labs may require more than one location. Subjectivity is involved in deciding how many matches or non-matches are required for excluding someone. New Trial Tr. 73-76, 260, 275.

{¶ 192} As a further matter, differences can exist depending on whether one is trying to exclude rather than include individuals. Some labs say that if they cannot include an individual, they cannot use the results for exclusion. Others say that if results cannot be used for inclusion, they can be used for exclusion only. Still others say the inclusion threshold can never be lowered and not even look if the result is below the threshold. Moreover, some labs say that if there is an indication of a mixture, it cannot be compared; only a single source can be compared. An analyst's experience may also come into play, as more experienced analysts may have a greater comfort level. A range of results can exist. New Trial Tr. 76-77, 124.

{¶ 193} In late November 2021, the Federal Public Defender sent Bode's electronic data on the rock to George Schiro, the lab director at Scales Biological Laboratory, to see if

he could analyze the data and obtain more information. Schiro ran the data through GeneMapper software, which takes raw data, examines it, filters it, and decides what peaks are there, what peaks are potentially true peaks as opposed to noise, and tries to determine the types from this data. When Schiro ran the data, he lowered the threshold to 20 RFU, well below Bode's analytical threshold of 75 RFU and BCI's threshold of 100 RFU. In fact, the BCI will not even analyze samples lower than that. In any event, by doing this, Schiro found more alleles. New Trial Tr. 241, 249, 250, 252-254, 772-773; Appendix to Relief Petition (June 21, 2022) ("2022 Relief Petition Appx."), Ex. 15-A. Bode's testing located alleles at 6 locations, but Schiro's lowered threshold yielded alleles at 12 locations; Myers was excluded from 6 of the 12 reported alleles. New Trial Tr. 140-141.

{¶ 194} During the new trial hearing, the State presented the testimony of Lewis Maddox, who was the technical DNA leader at BCI. According to Maddox, the BCI used FBI quality assurance standards and was accredited for DNA testing by the FBI through those standards. Maddox reviewed Bode's reports and data, Clement's documents, Schiro's report, the report from Cybergenetics (in relation to the spike, which is discussed below), as well as STR and Y-STR standards for Myers. Concerning rock A, Maddox agreed with Bode that the low-level data on the rock was not sufficient to make conclusions. New Trial Tr. 746-747, 749, 770, 811, 817-818; State's Appendix, Ex. 28, Maddox Aff., ¶ 6-13.

{¶ 195} In reviewing Bode's electropherogram associated with rock A, Maddox stated that he could not discern whether there was a major and a minor contributor. He further said it appeared to be a mixture profile at several locations, as several loci or a few locations in the DNA were indicative of more than one contributor to the sample. Maddox stated that BCI targeted one nanogram of DNA for testing, and when smaller amounts were targeted, stochastic effects could occur as well as partial profiles, as here. Where there are mixtures

76

of DNA, and one nanogram of DNA, for example, is tested, that means one contributor gave some portion of that total, and the other contributor gave another part. This is further complicated when the amount of DNA is so small as here, i.e., only .001 nanogram. New Trial Tr. 764-766.

{¶ 196} Maddox also disagreed with Schiro's use of an analytic threshold of 20 RFU, as BCI's threshold was 100 RFU, and BCI would not reduce that to reanalyze data at a lower threshold. New Trial Tr. 772, 822; State's Ex. 28 at ¶ 16-17. Ironically, one defense criticism of the State's trial DNA expert Dr. Blake was that he exceeded the recommended threshold of cycles for amplifying DNA and used a mixed sample obtained after amplification, which could have resulted from contamination and could have caused erroneous or distorted results, including making alleles disappear or become weaker or stronger. New Trial Tr. 94-97, 529, 533, 549-550, 552, 560, 567. However, the defense also relied on an expert who reduced the threshold that was followed by two other labs.

{¶ 197} In its decision, the trial court summarized these experts' testimonies but did not address any inconsistency or deficiency in the results that pointed to Myers' exclusion. The court also included significant discussion of matters that were not raised in the new trial motion and were irrelevant, such as critiques of Dr. Blakes' trial testimony. *See* New Trial Judgment, p. 6, 12-13. After summarizing the experts' testimony, the court did acknowledge that subjectivity exists in DNA interpretation and remarked: "Thus, DNA conclusions are, in fact, part of a subjective process." *Id*. at p. 19. The court then stated that the crux of the issue was whether "one DNA method [is] reliable enough to undermine another." *Id*. This was not the correct focus. In addition, the DNA evidence on the rock and railroad spike had nothing to do with the results on another piece of evidence—the foreign pubic hair. Furthermore, the

court focused on the DNA method used to analyze the foreign pubic hair, which was not the basis of the motion for new trial.

{¶ 198} In any event, there is considerable doubt about whether the DNA on rock A was sufficient to reach any conclusion about Myers. Both Bode and Maddox found the DNA results insufficient. One of the other experts, Schiro, based his opinion on a much lower threshold, and the remaining expert, Clement, opined that based on her opinion of her own expertise, Myers would have been excluded merely on the failure of a DNA match of one allele in a partial profile. This is not evidence that "weighs heavily in favor of the defendant." *State v. Elliott*, 2024-Ohio-3376, ¶ 63 (10th Dist.), citing *State v. Prater*, 2021-Ohio-3988, ¶ 20 (10th Dist.). Even if Myers' DNA was excluded as the contributor to the sample obtained from one of the three rocks, exclusion does not mean that Myers did not commit the crime. Comparing this evidence with the evidence admitted at trial does not reveal a strong probability of a different result. "The first *Petro* factor requires a defendant to show a strong probability of a different result; a mere possibility of a different outcome is an insufficient basis on which to grant a motion for a new trial." *Elliott*, at ¶ 62, citing *State v. Bressi*, 2020-Ohio-1217, ¶ 26 (9th Dist.). We address this point further below when we compare the evidence. We now discuss the new trial testimony as to the spike.

b. Testimony About the Spike

{¶ 199} The railroad spike was the other item that Clement recommended for testing in 2019; she recommended that the base of the spike be tested rather than the exposed head because the base or area under the head was where someone might have potentially touched the spike. The evidence was provided to Bode on July 31, 2020. When Bode tested this item, it tested the offset head (E07-A-1) (contrary to Clement's recommendation) and the area below the head (E07-B). According to the testimony of Bode analyst Sanney, it was

78

unclear whether the swabbed area included the rest of the spike or just a certain area below the head. New Trial Tr. 104, 107, 288, 304, 311; 2024 Appx., Ex. 4.

{¶ 200} Bode conducted Y-STR testing on the head of the spike, which revealed a partial Y-STR profile that was consistent with a mixture of at least two individuals. Due to the possibility of allele dropout, no conclusions could be made. Both STR and Y-STR testing were used on the area below the head. STR results include male and females, while Y-STR testing separates out male DNA. The STR testing revealed a major female contributor and a minor male contributor. Due to the case circumstances, it was reasonable that the major contributor was a female. No conclusions could be made about the male minor contributor due to limited data. The Y-STR testing on the area below the head resulted in a partial Y-STR profile consistent with a mixture of at least two individuals. Due to the possibility of allele dropout, no conclusions could be made. In contrast to rock A, Clement was not comfortable interpreting or expressing any opinion about the data for the spike sample; rather, she agreed with Bode's conclusions about the spike. New Trial Tr. 133, 164, 305-309, 312.

{¶ 201} As with rock A, Dr. Maddox found the amount of male DNA on the spike was very small and no conclusions could be drawn. For the offset head, testing showed .08 nanograms of DNA and for the area below the head, .12 nanograms. Furthermore, Maddox believed the DNA on the spike was highly degraded, and because there were multiple contributors to the .12 nanogram amount, any contributor would have contributed only a portion of that amount. Maddox again agreed with Bode's conclusions. New Trial Tr. 777-781, 785; State's Appendix, Ex. 28.

{¶ 202} Sanney, who tested the spike for Bode, was proficient in using STRmix, which was a probabilistic genotyping software that can assist DNA analysts in interpreting DNA

profiles, which was a service that Bode could have provided. On May 23, 2022, Bode sent a report to the Federal Public Defender that outlined its conclusions on the spike. Rather than having Bode further analyze the spike, Myers sent the spike to Cybergenetics, which used a similar probabilistic genotyping software, TrueAllele. Jennifer Bracamontes, a case work manager at Cybergenetics, performed the testing and reported the results to the Federal Public Defender on June 23, 2022. New Trial Tr. 209-310, 321-322, 330, 337, 349; 2024 Appx., Exs. 4, 18.

{¶ 203} Probabilistic genotyping refers to computer software programs that use probability modeling and statistical sampling to look closely at DNA mixtures. Such software interprets the mixtures, separates out contributors, and then compares people's DNA profiles to calculate match statistics. These software programs differ from manual testing on physical samples by labs. The software does not do further testing; it applies essentially a DNA calculator that can look all the way down to zero, not applying any thresholds, and work out different combinations of potential contributors to DNA profiles that are present in the underlying DNA data. In other words, Bracamontes relied on the data she received and did not know if only a tiny part of the spike may have been swabbed. She also was unable to tell how old the DNA was or how it got on the spike. At the time of the new trial hearing, the BCI did not use probabilistic genotyping software, although it did use the software program ArmedXpert to assist in its statistical calculations. New Trial Tr. 340-341, 345, 383-384, 827.

{¶ 204} While TrueAllele is a statistical program, an analyst must set a few inputs, such as the number of contributors (based on underlying data, such as counting allele peaks); whether to consider degraded DNA; whether a DNA sample looks like it has been damaged by the elements or chemicals; how long the computer should run, as in how many times it should go through each of the different variables; and how many cycles should be

run. TrueAllele only analyzes STR data; it cannot analyze Y-STR data. STR kits have a sex-determining marker that shows only an X (female) peak or a Y (male) peak; TrueAllele could look at this and separate the probabilities of whether contributors are male or female. New Trial Tr. 345-349, 388. Thus, to some extent, even this statistical program had subjective components, including an analyst reviewing peaks and counting them based on his or her experience, deciding if a sample is degraded or damaged, and so forth. Bracamontes failed to discuss what decisions she made while inputting these parameters into the program.

{¶ 205} According to Bracamontes, the software initially did not consider specific data such as Myers' reference sample for comparison. The software first did a series of calculations based on data about the height of peaks, the allele number, the pattern, and the variation to separate out the profiles from the mixture, which in this case, were determined to be a major contributor and a minor contributor. During this process, the software tried out hundreds of thousands of possibilities, accounting for many different variables and comparing these patterns to the data. Possibilities that looked like the data were given greater probabilities; those that did not received lower probabilities. In deciding the number of contributors, the software did not look at just one DNA location; it considered all locations. Based on this process, it was determined that there was a female contributor accounting for 90% of the DNA mixture and a minor male contributor. There was DNA at one location at which there could have been a second minor contributor, with a 50-50% chance of it being female or male. New Trial Tr. 359-363, 389, 390-392.

{¶ 206} To calculate match statistics, the software considers the probability of a random person having the same allele pair at a particular location based on population statistics done by the FBI. If the allele comparison shows the possibility of a match is higher than the possibility of a coincidental match, that would be inclusionary, and a value for that

81

likelihood would be calculated. Similarly, if the possibility of a match is smaller than the possibility of a coincidental match, that would be exclusionary, and the value of that would be calculated as a number less than one. Based on a comparison with Myers' reference sample, Cybergenetics' report stated that a match between the spike sample and Myers would be 1.26 quintillion times less probable than a coincidental match. This was based on running the data for two contributors; running it for three or four would not change the probability much. Thus, even if the test were run for one to four contributors, Myers would still be excluded. New Trial Tr. 366-375, 390.

{¶ 207} To date, TrueAllele has been addressed in Ohio by only the Eighth District Court of Appeals, which considered it to be scientifically accepted. *See State v. Preston*, 2021-Ohio-2278, ¶ 48 (8th Dist.), citing *State v. Blevins*, 2018-Ohio-3583, ¶ 32 (8th Dist.). Other jurisdictions have found the software's match statistics sufficiently reliable to warrant admission. *E.g., United States v. Anderson*, 673 F.Supp.3d 671, 688 (M.D.Pa. 2023).

{¶ 208} STRmix, a competitor of TrueAllele and the "'market leader in probabilistic genotyping software,'" was created by a scientist with a government agency in New Zealand in 2011. It has been widely used in more than 45 of the 200 forensic laboratories in the United States, including the FBI, with 68 more labs in the process of validating it as of 2021. *United States v. Gissantaner*, 990 F.3d 457, 461-462 (6th Cir. 2021), quoting R.146-1 at 17. The Sixth Circuit Court of Appeals has found that STRmix meets the requirements for admissibility under *Daubert*. *Id*. at 463-467, applying *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593-594 (1993), and Fed.Evid.R. 702.

{¶ 209} A difference exists between allowing admission of evidence under *Daubert* and deciding if the testimony in a particular case should be credited. "[I]f there are questions about the reliability of testimony based on STRmix statistics, such questions 'generally go

82

to the weight of the witness's testimony, not its admissibility.'" *United States v. Washington*, 2020 WL 3265142, *4 (D.Neb. June 16, 2020), quoting *Robinson v. GEICO Gen. Ins. Co.*, 447 F.3d 1096, 1100 (8th Cir. 2006). The same observation would apply to TrueAllele, which is a similar system.

{¶ 210} The point here is not to question general admissibility of the TrueAllele evidence in this case. The trial court did not hold a *Daubert* hearing, nor did it even refer to *Daubert*. Instead, the court simply found that the TrueAllele method itself would be reliable—in effect making a *Daubert* conclusion without saying so. *See* New Trial Judgment, p. 12. However, in deciding if the "new" evidence creates a strong probability of a different result, the weight to be given that evidence would be a proper consideration. The trial court appears to have given preclusive effect to the TrueAllele statistics without considering matters that undermine its weight, such as the extremely small amount of DNA originally found on the spike, and more importantly, the very low amount of DNA of the two minor contributors.

{¶ 211} Bracamontes stated that 90% of the DNA mixture was female DNA (consistent with the victim) and that only 5 to 10% of the mixture came from the minor contributor. New Trial Tr. 392. Bracamontes also said there could be two minor contributors and assessed a percentage of whether one of those contributors was female as 50-50. Thus, the mixture had at least two contributors and possibly three, two of which were minor. Bracamontes did not quantify the proportion of the sample that minor contributor would have contributed to the 5% to 10% of the DNA attributed to the minor contributors.

{¶ 212} Fairly recently, the Sixth Circuit Court of Appeals reviewed a district court decision that had excluded STRmix evidence as unreliable. *Gissantaner*, 990 F.3d at 460. As noted above, STRmix and Trueallele are the two most frequently used probabilistic genotyping systems. *Lewis*, 442 F.Supp.3d at 1140.

{¶ 213} In *Gissantaner*, the court remarked that while DNA evidence had been a staple in law enforcement investigations since the 1980s, "[c]omplications arise when a sample of evidence, usually a batch of cells included in fluid emitted by an individual or left on an item by touch, contains the DNA of more than one person." *Gissantaner* at 460. As here, three DNA contributors were found on an item of evidence in that case, a gun. *Id*.

{¶ 214} In discussing the complications, the court noted: "One challenge with using mixtures involving several people is that each person might have contributed zero, one, or two alleles at each locus." *Id*. at 461. This would be relevant in situations like the present, where Bode could not reach any conclusions about the spike sample due to allele dropout. Bode found alleles at only a few locations out of the 22 tested. Specifically, only 6 locations of the sample from the offset head reported alleles, and on the area below the head, only 7 locations of the sample showed alleles. No minor alleles were reported for the samples from the offset head or the area below it. New Trial Tr. 305-306; 2024 Appx., Ex. 4, Table 2.

{¶ 215} Ultimately, in *Gissantaner*, the court found the STRmix process sufficiently reliable under *Daubert* and reversed the lower court's decision on admissibility. The court did note that the defendant, who was included due to the test, would have the chance on cross-examination to question how the laboratory handled the sample and to identify software defects. *Gissantaner*, 990 F.3d at 470. This is consistent with the distinction between the weight and admissibility of such evidence. The court also stressed that the low 7% figure of the defendant's DNA as a contributor, "created thanks to STRmix," suggested the defendant "contributed only 8 or 9 cells to the mixture of DNA found on the gun." *Id*. As a result, the DNA could have been deposited on the gun by other means, as holding the gun would not be the only way DNA could be on the gun.

{¶ 216} The federal district court's analysis in *United States v. Lewis*, 442 F.Supp.3d 1122, is instructive on the subject of samples containing low amounts of DNA. In that case, the defendant, Lewis, was charged with being an armed career criminal in possession of a firearm. The defendant had struggled with officers and a landlord preceding his arrest, and a gun was recovered at the scene. The defendant claimed the gun had been planted; as a result, his DNA, the officers' DNA, and the landlord's DNA were tested using STRmix. *Id*. at 1125, 1133. The test revealed four contributors, with the DNA mixture being "'greater than one billion times more likely if it originated from [Lewis] and three unknown unrelated individuals than if it originated from four unknown unrelated individuals.'" *Id*. at 1126, quoting the record. The court noted that "[t]his statistic, called a likelihood ratio ('LR'), is interpreted as providing 'extremely strong support for inclusion' of Lewis as a contributor to the DNA mixture found on the gun." *Id*., quoting the record. The defendant was determined to be the highest contributor in the mixture, and it was estimated that he contributed 56% to the DNA, with the lowest contributor estimated as having contributed only 6%. *Id*. The officers and landlord were excluded. *Id*.

{¶ 217} After holding three days of hearings including expert testimony and receiving a report from a special master on scientific reliability, a magistrate judge found the evidence of the defendant's inclusion met *Daubert's* standards, but the DNA evidence on exclusion fell below "STRmix's established threshold for reliability." *Id*. at 1127. In their discussion, both the magistrate judge and the district judge, who considered objections, focused on "a 2016 report by the President's Council and Advisors on Science and Technology ('PCAST') that addressed the validity and reliability of probabilistic genotyping software programs such as STRmix." *Id*. at 1128.

{¶ 218} After examining the published evidence, the PCAST Report found: "'The two most widely used methods (STRmix and TrueAllele) appear to be reliable within a certain range, based upon the available evidence and the inherent difficulty of the problem. Specifically, these methods appear to be reliable for three-person mixtures *in which the minor contributor constitutes at least 20 percent of the intact DNA in the mixture* and in which the DNA amount exceeds the minimum level required for the method.'" (Emphasis added.) *Id.*, quoting PCAST Report, p. 80. The court further noted that a 2017 addendum to the report had clarified "that the concerns related to the minor contributor arise when the person of interest contributes less than 20% of the DNA in the mixture." *Id.*, citing Addendum PCAST Report, p. 8.

{¶ 219} Because the STRmix later satisfied the validation concerns the report mentioned, both the magistrate and court found that STRmix process itself was reliable. *Lewis*, 442 F.Supp.3d at 1129-1131, 1139-1158. Applying the results of the test to the defendant's inclusion, the court found it was admissible because "the DNA analyzed was of sufficient quality and quantity, and the major contributor's contribution percentage of 56% is well above even the 2016 PCAST threshold for reliability (i.e., minor contributor must contribute at least 20% of the DNA mixture." *Id.* at 1158, citing PCAST Report, p. 82. Moreover, "'[a]ll of the defendant's alleles across 22 [sic] loci were detected in the mixture, so this is not a case where the difference between an incriminating or exculpatory finding depends critically on the correctness of the parameters . . . that might not have been adequately evaluated for the circumstances at hand.'" (Bracketed text in original.) *Id.*, quoting Special Master Report, p. 41.

{¶ 220} This differs from the current situation, which involves two minor contributors whose contribution was between 5% and 10% and whose relative contributions were not

delineated. In addition, here the alleles of minor contributors were not located at any locus, and the major contributor's alleles were reported at only 6 to 7 loci, with some appearing as only partial. The 20% threshold for reliability discussed in *Lewis* is consistent with Maddox's testimony about mixtures where small amounts of DNA can cause stochastic effects, which include alleles not amplifying or dropping out or amplification of one donor over another. Further, where there are multiple minor contributors to a DNA sample, as on the spike, each contributor will have contributed only a portion, so each contributor's share will be less than the total amount of the DNA contributed. Here, there was no indication what portion each minor contributor on the spike may have donated. During testimony, Maddox stated that he was aware of the PCAST Report and that it addressed concerns with forensic testing. New Trial Tr. 765-769, 777-781, 850-851, 853, 856.

{¶ 221} The point is not that TrueAllele is unreliable as a software program. Rather, the low amounts of DNA present on the spike and the mixture of contributors contributing quantities below what has been said to be reliable raise questions about the weight to be given to the results reached. Low DNA levels also can affect conclusions about the number of contributors ("NOC"), which in turn can alter results. "It is well known that underestimation of the assumed number of contributors leads to false exclusions, though at an unspecified rate. If any of the excluded individuals were in fact contributors, their percentage contribution is exceedingly small and well below STRmix's established threshold for reliability." *Lewis*, 442 F.Supp.3d at 1165.

{¶ 222} "That even experienced DNA analysts who are asked to determine NOCs in complex mixtures too often get it wrong is well understood. Controlled studies have shown that even when using standard protocols, the risk that a DNA analyst will underestimate the true number of contributors to a DNA mixture is not insignificant. And the underestimation of

NOCs may also lead the analyst to falsely include an innocent person or falsely exclude a true donor." *United States v. Johnston*, 2025 WL 964073, *27 (E.D.N.Y. Mar. 30, 2025).

{¶ 223} The trial court did not address these issues. It also did not consider Dr. Maddox's point that he did not see a full DNA profile across the multiple items of evidence he examined, and that the items were very partial in mixtures and results obtained. Maddox further said he did not see any common profile that would have indicated the presence of one person's DNA on those items. New Trial Tr. 785-786; State's Appendix., Ex. 28, ¶ 21. If a common profile had been discovered on the rock and the spike, it might have been more consistent with the defense theory that an alternate suspect was involved. We realize Myers contends two people, Grimes and Rogers, were involved. However, there is no evidence that either of these individuals' DNA was on the rock or the spike.

{¶ 224} Even if we disregard the low level of DNA discovered and accept that Myers was excluded from the rock and the spike, this does not mean he was not present, nor does it mean that there is a strong probability that the result would be different. To make that conclusion, the evidence at trial court needs to be compared, which as we have said, the trial court did not do. Set in opposition to Myers' current claims about the new DNA evidence is the evidence of his guilt. We now consider the evidence presented at his trial, bearing in mind our detailed discussion of the evidence in the paragraphs above.

2. Evidence at Trial

{¶ 225} For purposes of clarity, we refer to the two bars or taverns involved at the time of the murder, Five Points Tavern (also known as Leahy's) and the Roundtable, as Five Points and Roundtable, respectively. We begin with testimony about events that occurred before the murder.

### a. Events Leading Up to and Including Glenn Smith's Arrest

### i. Glenn Smith

**{¶ 226}** At the time of the murder, Smith and Amanda had been living together for about two years, and she was the mother of his daughter. They had moved to Xenia a few months earlier and were living with Amanda's mother and stepfather. Smith worked at a local factory and bartended at Five Points on weekends. On August 3, 1988, Amanda and Smith looked at a home they were thinking about renting, went to Five Points, and stayed until around 7:00 or 7:30 p.m. They then went to the Greene County Fair. When they left home, Smith had around $130 in his wallet. They stayed at the fair until 9:30 or 10:00 p.m. and then went back to Five Points. At that time, Smith had worked at Five Points for a few months and had seen Myers in the bar as a customer about a half-dozen times. Tr. 692-699, 707-709.

**{¶ 227}** After returning, Smith was drinking bourbon, and he played pool with another bartender, Lee. Myers came to Five Points between 10:30 and 11:00 p.m. and wanted to play pool. They played quite a few games, playing for drinks or money. Myers was drinking as well. Around 10:30 p.m., Smith went outside, drove around for about 15 minutes, then drove to the Roundtable, where he had a drink; he left Amanda at Five Points. At that time, Myers was playing pool with someone else. About 15 minutes before Smith left, Myers made a reference to the Mickey Mouse shirt Amanda was wearing; it was to the effect of Myers wanting to play with Mickey's ears because of the way they were positioned, presumably on her chest. Smith told Myers that Amanda was with him, and he didn't appreciate it (the remark). Tr. 699-700, 710-713.

**{¶ 228}** Smith returned to Five Points, and Myers was still playing pool. He and Myers continued playing pool and drinking. Smith, Amanda, and Myers then went down to the

Roundtable in Smith's car. It took five minutes or under to get there, and they arrived probably around 12:30 a.m. When they got to the Roundtable, Amanda went into the bar. Smith and Myers stopped out front before going in and had a few more words about the way Myers was talking to Amanda. It was more of the same about Amanda's shirt, and Myers mentioned Amanda's "tits." Smith felt Myers had been "hitting on" Amanda in the car. By that time, Smith was getting upset and told Myers that he would not be riding back to Five Points with him. Tr. 713-717, 785.

{¶ 229} There is no question that Smith was very intoxicated, as he had drunk a fifth of bourbon that night. When he and Myers went into Five Points, the bartender warned them, as she was afraid they were going to get into a fight. Smith then got mad and threw a glass on the floor. He testified that he felt that Myers was still bothering Amanda because at one point at the Roundtable, Amanda had said something about Myers needing to leave her alone. Tr. 717, 762, 786-787.

ii. Marcus Lee W. ("Lee").

{¶ 230} On August 3, 1988, Lee was employed at Five Points tending bar. He knew Myers, as Myers stopped by the bar often. He did not know Smith very well. Smith and Amanda came in around 6:45 p.m., stayed 15-20 minutes, and went to the county fair. They came back around 8:30 or 8:45 p.m., and Myers came into the bar around 7:30 p.m. Smith and Myers were doing Jim Beam "slammers"; they each had six or eight. They all stayed for around an hour and a half, and all three were going down to the Roundtable together. Lee did not recall seeing Smith leave Five Points alone, nor did he recall seeing Amanda and Myers leaving together. After the three left, the next time Lee saw them was around 12:30 a.m. They stayed for a little while and then went back to the Roundtable around 12:50 a.m. Lee saw them all leave together in Smith's car. That was the last time Lee saw

Smith and Amanda that night. He did not see any fights between Smith and Myers in the bar. Tr. 941-942, 945-950, 956.

### iii. Teresa M.

{¶ 231} On August 3-4, Teresa was employed as a bartender at the Roundtable. She knew Myers as a patron and had seen Smith a few times; she had never met Amanda. Around 1:00 a.m., Myers, Smith, and Amanda entered the bar together and were already arguing. Amanda was upset about them driving the car too fast. Teresa did not serve Amanda any alcohol. Smith was being kind of rowdy and getting loud and slamming his drink. Smith and Myers were drinking "whiskey slammers." Teresa served both Smith and Myers three slammers. Smith was slamming his drink down, and Teresa told him he had to quit or leave. Smith then threw his drink on the floor, and Teresa told him to leave. He did not, so she called the police. As Teresa was cleaning up the glass, she told Amanda that she had called the police and wanted Smith to leave. Amanda walked out the door, and Smith followed her. Tr. 795-796, 798-804.

### iv. Officer Savage and Officer Rinehart

{¶ 232} On August 3, 1988, Officer Savage was a uniformed patrolman for the Xenia PD and was assigned as a road officer on the 6:00 p.m. to 6:00 a.m. shift. At 1:13 a.m. on August 4, Savage received a dispatch assigning him as a backup officer to Officer Rinehart, who had been dispatched to the Roundtable. When Savage pulled in, Reinhart had already arrived. Two people, later identified as Smith and Amanda, were standing by the rear of a maroon Chevy Malibu. When Rinehart arrived, he went into the bar to talk to the bartender, who said the disorderly patron had left and described him. Rinehart then went outside to the parking lot and saw Savage talking to a man and a young woman, Smith and Amanda, at

91

the left edge of the parking lot, near a guardrail that divided the Roundtable parking lot from the American Legion Club parking lot. Tr. 838-840, 878-882.

{¶ 233} It was clear that Smith was intoxicated, and he was being loud and abusive. At this point, only the four of them were present; Rinehart did not see Myers. After warning Smith several times to settle down, Savage arrested Smith and placed Smith, handcuffed, in his cruiser. Amanda followed them over to the cruiser. Neither officer had seen Amanda or Smith before. Savage asked for Amanda's ID, and she produced a Georgia driver's license from her back pocket; Savage then returned it to her. Amanda asked what it would take to get Smith out of jail and was concerned about how she would get home, as she did not have any money. Amanda asked Savage if she could have Smith's wallet, and Savage reached in Smith's pocket and gave it to her. There was also conversation about car keys. As Savage was talking to Amanda about her transportation, another person, later identified at trial as Myers, walked up. Savage had never seen him before. Tr. 841-848, 862, 869, 885-888, 891-892.

{¶ 234} Myers addressed Savage as "Mr. Savage," put out his hand, shook Savage's hand, and said, "I will make sure she gets home. I will take care of her." Tr. 847. Savage asked Amanda if that was okay with her, and she said, "Yeah, I guess so." Tr. 1848. Myers also stuck his head in the cruiser window, which was open, as it was summertime, and said, "I will take care of her. Glenn." Tr. 848. Officer Rinehart also heard the man make these remarks. Rinehart had never seen the man before but identified him as Myers at trial. Tr. 891-892.

{¶ 235} Regarding the car keys, Smith thought he had given Amanda the car keys before being arrested, but when he got to the jail, he realized that the key was in his pocket. The key was on a ring with a clip and must have slipped off the clip when he took it from his

92

pocket. What Amanda must have ended up with was the ring and a back ring of keys. Tr. 723, 726.

{¶ 236} Savage left the Roundtable about 1:20 a.m. to transport Smith to the jail. Rinehart followed Savage until he got to the sally port and then Rinehart went on. Rinehart cleared the matter at 1:23 a.m. when he left the jail. He then went back to his normal patrol duties. Rinehart did not recall exactly which way he drove, but he went to Detroit Street. He proceeded southbound on Detroit Street and made a left on Home Avenue. Tr. 850, 892-894.

{¶ 237} The Roundtable was located on Home Avenue. Five Points, where Myers' car was parked, was located to the northwest. As noted, a person could walk north from the Roundtable on Home Avenue, take a shortcut through the abandoned railroad area, and reach Five Points. Tr. 838.

b. Events After Glenn Smith's Arrest

i. Charles V.H.

{¶ 238} Charles came to the Roundtable with his future wife at around 1:00 a.m. on August 4. He had seen Myers around town and identified him at trial. Myers was with two people, Amanda and Smith, whom Charles had also seen around town. After Smith was arrested, Myers approached Charles and asked if he had cables to give him a jump. Charles went outside and hooked up his cables, but there were no keys, or he could not find a flashlight, so he unhooked the cables and went back inside. Amanda was with them outside. Amanda and Myers came back in the bar, and they sat there for a few minutes. From what Charles gathered, Myers was trying to reassure her that Smith would be okay. Myers had his arm around Amanda, telling her that everything would be okay and that he would take care of everything, not to worry. Tr. 821-823, 828-829.

93

**{¶ 239}** Five or ten minutes later, Myers and Amanda came to Charles' table and asked if Charles could give them a ride home or somewhere. He said he would if they could wait fifteen minutes for Charles to get another beer. Myers said he could not wait, and he and Amanda walked out the door. Myers had his arm around Amanda, reassuring her. As Charles went up to get another beer, he happened to look out the door and saw Myers and Amanda walking across the parking lot toward the gas pumps and Home Avenue Tr. 829-831.

### ii. Teresa M.

**{¶ 240}** Teresa was the bartender at the Roundtable. After Smith was arrested, Amanda and Myers entered the bar looking for some keys. Shortly thereafter Amanda reentered the building and asked Teresa if she had a flashlight. Teresa thought Myers was with Amanda. Teresa had a flashlight. Amanda took the flashlight and eventually brought it back. Next Amanda said she had another set of keys at home and wanted to get home. Teresa heard Myers tell Amanda that he would give her a ride home. Amanda then left with Myers. Tr. 804-806, 817.

### iii. Rinehart

**{¶ 241}** After Officer Rinehart had resumed his patrol at 1:23 a.m., he turned onto Home Avenue at around 1:35 a.m. at the latest. While on the 100 block of Home Avenue, in the area just off South Detroit on Home Avenue, Rinehart noticed two people walking on the sidewalk on the south side of Home Avenue. As he approached them, he noticed that they were two of the three people he had dealt with at the Roundtable 10 or 15 minutes earlier, Myers and Amanda; they were walking from the area of the Roundtable, heading northwest towards South Detroit Street, which was about 150 yards away. Nothing obstructed Rinehart's view, and he was clearly able to see them. This was about 300 yards from where

94

Amanda's body was discovered. When Rinehart came on duty later in the day on August 4, he reported to Detective Green, the person in charge of the murder investigation, that he had seen Myers and Amanda walking on Home Avenue. Tr. 894-898, 1088, 1109, 1117, 1119, 1211-1212.

### iv. Stephen Hale

{¶ 242} At the time of trial, Hale was the director of the Center for Human Identification for BCI. At the time of the murder, Hale was working for the Greene County Prosecutor's Office as an investigator. After the murder, Hale and Rinehart went to the location where Rinehart had seen Myers and Amanda walking, and Hale took measurements. Rinehart was with Hale, and it was determined that Rinehart was 15½ feet from Myers and Amanda when he saw them. Hale also did time studies to find how long it would take a person to walk or drive from various points and determined that it would have taken Myers 4 minutes and 30 seconds to walk the same route. Tr. 584, 589-595.

{¶ 243} The most direct walking route from the Roundtable to the homicide scene would have been to go down Home Avenue and cross over the old railroad yard. Hale determined that a person of Amanda's size would have taken 10 minutes to walk from the Roundtable to the homicide scene, a distance of .40 miles. Driving the most direct route from the Roundtable to the homicide scene at the speed limit took 1 minute and 7 seconds. Driving from Five Points to the Roundtable, using the most direct route (.70 miles) and going the speed limit, took two minutes; using the second most direct route (.80 miles) also took about two minutes. Tr. 590, 595, 601-603.

### v. John Irwin

{¶ 244} Detective John Irwin, a Xenia police officer, was 5'8", close to Myers' height. He also did a time study walking from the Roundtable, cutting across the railroad yard, and

95

going to Five Points. It took about 12 minutes and 30 seconds. Using the longer route (not cutting through the railroad yard) took around 14 minutes. Irwin also drove from where Myers' car was parked at Five Points to the Roundtable. The drive, in moderate traffic and during the afternoon, took about three and a half minutes. Tr. 1190, 1212-1214.

### c. Evidence About Myers' Actions After Glenn Smith Was Arrested

#### i. Lee M.W.

{¶ 245} As noted, Lee was the bartender at Five Points and last saw Myers, Smith, and Amanda a little before 1:00 a.m. He did not see Myers again until 2:10 a.m., at last call. At that time, Lee looked out the door of the bar and saw Myers was getting in his car, which was parked across the street from the bar about 55 to 60 feet away. Lee was sure it was Myers. When Lee saw Myers, he was by himself and was opening the car door. Myers got in the car, backed it out, and headed back toward the Roundtable. Tr. 950-952.

#### ii. Brenda H.O.

{¶ 246} Brenda had met Myers through a friend of hers, Diana, and saw him around midnight (i.e., the start of August 4) at the Roundtable. Myers was with Smith, whom Brenda also knew, and she observed them drinking and arguing about drag-racing. About 15 minutes later, a girl (Amanda) came in to use the restroom, came back out, and was crying. Next, Brenda saw Myers and Smith "getting into it." About a half hour after Myers arrived at the bar, Brenda was getting ready to leave with a friend, and Myers wanted to talk to her. They were talking outside when the police arrived. When Myers saw the police, he ducked down and tried to get in Brenda's car. She told Myers she had to go. After the police went into the bar, Myers ran up into some trees behind the Roundtable. That was the last time Brenda saw him until 2:10 a.m. on August 4. Tr. 1429, 1431-1434, 1445.

**{¶ 247}** After Brenda drove her friend home, they both decided to walk to another bar, but it was rowdy, so they went back to the friend's house and talked for a few minutes. Brenda then went to Five Points because she needed to use the restroom. She saw Myers' car parked, and when she walked in, she asked Lee where Myers was. Lee said Myers had left with another guy and a girl. Brenda then saw Myers getting into his car at 2:10 a.m. When she saw Myers that night, he did not have a bandage on any of his fingers. Tr. 1435-1436, 1445-1446.

### iii. Teresa M.

**{¶ 248}** After Myers left the Roundtable, Teresa (the bartender) did not see him again until 2:15 a.m. on August 4. Myers came in and asked if he could get a drink. Teresa told him to drink it quickly as it was last call. Myers went to the restroom, was in there for a few minutes, and then sat down next to Don H. Teresa heard Myers say that when he left with Amanda and they were walking, Amanda started acting crazy and told him that he had set her boyfriend to be arrested or something. Amanda then took off running. Myers did not say where they were when this happened. That was the only conversation Teresa had with Myers, and she did not hear his conversation with Don H. Tr. 806-809.

### iv. Don H.

**{¶ 249}** Don was in the Roundtable when Myers came back. It was after the last call had been made. Myers came out of the restroom and sat down next to Don. Myers wanted to talk about someone who had kicked in the door of the van of Don's roommate. Don asked Myers if he "got any"—that is, sex. Myers responded that he had tried but she was not willing, so he had just dropped her off. Don and Myers left the Roundtable at closing, which was 2:30 a.m. They got to Don's house around 2:40 a.m. Myers told Don's roommate what he

97

wanted to tell him and left after about 15 minutes, which would have been close to 3:00 a.m. Tr. 962-964, 966-967, 978.

### d. Events Leading Up to Myers' Arrest

{¶ 250} Two teenage girls discovered Amanda's body around 3:00 a.m. At the time, Amanda was still alive and gasping for air. There was some delay in calling the police, as the girls had to run home and were scared. Tr. 1022, 1026-1027, 2626, 2928.

{¶ 251} Around 3:30 a.m., Officer Savage received a dispatch reporting that a nude female was lying along the railroad bed or tracks. When Savage received the call, he was at the intersection of Locust and South West Street investigating a burglary (the Grimes matter), so he ran to the scene. When he arrived, a young woman, Amanda, was on her back, gasping and gurgling. She had labored breathing. Concluding that she was dying, Savage called for homicide assistance. He did not recognize the woman as the person he had seen two hours before. Tr. 851-856. Amanda was transported to the hospital and died around 6:30 a.m. Tr. 3171.

{¶ 252} David Green, a detective with the Xenia PD, was called at 3:45 a.m. on August 4, 1988, about a possible homicide and went to the scene. Amanda had been removed from the scene by then, but the police did not know who she was. Detective John Irwin arrived on scene to start taking photos, and the police also asked BCI for agents to help in collecting evidence. While Green was still on the scene, BCI agent Robert Setzer, arrived. Green returned to the police station, and he learned that the victim may have been identified and was given a name. By that time, Grimes was already in custody and was being interviewed by Detective Linkhart. The police investigated where Amanda had been before her death. This included talking to Smith and interviewing patrons and individuals who had been at the Roundtable and Five Points. Tr. 1088, 1090-1091, 1093, 1095, 1097-1099.

98

{¶ 253} After attending part of Amanda's autopsy as well as a search of Glenn Smith's car, Green returned to the police station around 3:00 or 4:00 in the afternoon of August 4. By this time, Myers was at the police station and was being interviewed by Detective Irwin. Green ran a records check on Myers through the PD, as well as a computerized criminal history inquiry. He obtained information about an incident that occurred in 1986, two years before, in which the Greene County Sheriff's Department had arrested Myers and charged him with a sexual offense. Green looked into that case because he felt the facts were significant to the current investigation. Officer Rinehart then came on duty and informed them about seeing Myers and Amanda walking together on Home Avenue. Tr. 1104-1109. This brings us to the various statements Myers made about the crime.

e. Myers' Initial Statements to Detective Irwin on August 4, 1988

{¶ 254} Detective Irwin was one of the officers who went to Myers' house and took him to the police station for an interview on August 4. After Irwin informed Myers of his constitutional rights, Myers signed the pre-interview form in the presence of Irwin and then-Detective Lyons. Tr. 1207-1208.

{¶ 255} In pertinent part, Myers said that he had been at Five Points earlier in the evening and had gone to the Roundtable with Amanda and Glenn Smith in Smith's car, that Smith had kicked him in the leg before going into the Round Table, that Smith became noisy and broke a glass, and that the police were called on Smith. Tr. 1210. Myers further stated:

> He went outside when the police came to take Glenn out, him and Amanda,
> so then he walked back into the bar. Amanda looked for a flashlight to look for
> the keys and she went out of the bar and then when he – he said he had to
> get his car at [Five Points]. He walked out of the bar and Amanda wasn't out

there. He didn't know where she was at and he proceeded on, proceeded to get his car.

Tr. 1210.

{¶ 256} While Irwin was conducting the interview, he was told that the bartender, Lee, was at the station. Irwin spoke with Lee and went back to talk further with Myers. When Irwin asked Myers if Amanda had ever been in his car, Myers said no. However, when Irwin said that he had been told that Amanda had ridden with Myers out from Five Points, Myers said, "Oh yes, I forgot that." Tr. 1210-1211. During the interview, Irwin was also called out to speak with Rinehart. After doing so, Irwin asked Myers when he last saw Amanda. Myers said when he last saw her, she was on her hands and knees in the parking lot looking for car keys. Myers said he went back in the bar and when he came back out to go get his car, Amanda was not there, and he did not see her after that. Tr. 1212.

f. Myers' Interview with Detective Green on August 4

{¶ 257} After receiving information from Detective Irwin about his interview with Myers, Detective Green and Robert Setzer went to talk with Myers. As a field test, Setzer took swabs of Myers' shoes and hand to see if any indicator of blood would be found. Setzer took a cotton-tipped, wooden-shafted swab, moistened it with distilled water, and swabbed under the right index fingernail of Myers' right hand. In this process, one drop of a chemical called phenolphthalein was put on the swab, followed by one drop of hydrogen peroxide. A color change meant a positive reaction. When Setzer applied the hydrogen peroxide, there was an immediate color change to a dark or very bright pink, indicating there may have been blood under Myers' right index fingernail. Setzer did the same test on Myers' shoes and again obtained an instant result indicating blood. It was the same color reaction Setzer obtained on the finger. Setzer took a cotton cloth and tried to get a sample of any remaining

100

blood under Myers' index finger, as well as a swab from an area of the finger for a control sample. He also took a swab from the shoe. Tr. 1100, 1508-1510.

{¶ 258} When asked about how blood had gotten on his shoe, Myers said he had been in an accident in early July, had sustained injuries, and was wearing the same shoes at the time. The shoes were sent to BCI for testing. While there was a small amount of human blood on the shoes, it was insufficient for testing. The shoes were later sent to Dr. Blake, who did PCR testing. Blake was somewhat successful on one very small spot, which indicated that the blood did not originate from Amanda. Tr. 1114, 1573, 1601-1602, 1654, 1708, 1974-1975.

{¶ 259} Returning to Myers' statements and conduct during the interview with Green and Setzer, Myers stated that Smith drove recklessly to the Roundtable, and they argued briefly about that when they arrived. They all went into the bar, and Myers and Smith had a confrontation, which ended up outside the bar where the police were called and did respond. Smith was arrested, and Myers spoke with an officer and offered to help Amanda look for the car keys because they were missing. Myers assisted Amanda in the parking lot, but she eventually told him to leave her alone and just go away. Myers said that he went back into the Roundtable briefly by himself. He assumed Amanda was just upset over the keys. He was inside the bar for a few minutes and then left the bar by himself; Amanda was not with him when he went back inside the bar. Myers said he then walked from the Roundtable to Five Points where his car was located. He picked up his car, drove it back to the Roundtable, and went back inside. When he got back to Roundtable, he was only there a short time, had one drink, and spoke with another patron. Tr. 1116-1118.

{¶ 260} Myers denied that Amanda was in his vehicle at any time. Myers said he did not know what happened to Amanda, that he walked alone from Roundtable to Five Points

101

to pick up his vehicle, and that he then drove in his car back to Roundtable. After being there for a short time, he left with a patron and not too much after that, he went home because he was working construction at the time and needed to get up fairly early. When Green said he had a witness who had seen Amanda walking with Myers from the Roundtable up Home Avenue toward Railroad Street, Myers did not respond. Green said he knew what had happened to Amanda and that she was dead. Green showed Myers pictures of Amanda and said the circumstances were exactly like those that the Greene County Sheriff had previously arrested Myers for. Myers made no response. Myers was pretty much indifferent. Tr. 1118-1120.

### g. Myers' Deposition Statements Read at Trial

{¶ 261} Myers' deposition was taken on November 17, 1992, in connection with a civil case Myers had filed against the Greene County Commissioners, Greene County Prosecutor William Schenck, and the Xenia PD. During trial, parts of the deposition were read to the jury. At the time of the deposition, Myers was in prison after pleading guilty to and being convicted of 11 fourth-degree felonies in April 1991. The convictions were for passing bad checks, and the court had sentenced Myers to three years in prison. When the deposition was taken, Myers was no longer under indictment for the murder, as the prior indictment had been dismissed. Myers also expected to be released from prison in February 1993 with no probation requirements. Tr. 2286-2287, 2295-2297. Myers did not testify at trial other than during the mitigation phase.

{¶ 262} Myers testified in his deposition that on August 3, 1988, he went to work early in the morning and worked ten hours in a little town south of Wilmington, Ohio. His company was laying sewer lines; Myers' job was to finish the bottom in manholes, cementing them

down. Tr. 2299-2300. The rest of Myers' testimony is lengthy, so we refer only to the relevant points.

{¶ 263} Myers was unsure when he first arrived at Five Points on August 3. He said he had made notes about the events of August 3 and 4 but had given them to his attorneys at the time and had not seen the notes since. He also said he had not made any notes before that time. Myers later said that he probably trashed the notes he made for his attorney after they had a meeting at the jail and did not think he gave the notes to his attorneys. Tr. 2307-2308, 2330.

{¶ 264} After spending some time at Five Points, Smith, Amanda, and Myers decided to go to Roundtable. Smith was carrying his bottle of whiskey in a paper bag, and Smith and Amanda argued about who was going to drive. Smith got mad, broke the bottle against his car, jumped in, and left. Myers and Amanda tried to follow Smith, but Myers couldn't keep up with him. As a result, Myers and Amanda went to the Roundtable. Amanda stayed in the car while Myers went inside to see if Smith was there, but he was not. They returned to Five Points, and Smith came back about five or ten minutes later. They all decided to try again, and that is when they left; Smith drove. Tr. 2314-2315.

{¶ 265} While they were driving through the time they got to the Roundtable, Smith and Myers had an argument or heated discussion. On the way to the Roundtable, they were all in the front seat; Amanda was in the middle. Because Smith was driving crazy, Myers reached over and turned off the ignition. Smith turned the ignition back on and mellowed somewhat. When they got to the Roundtable, Smith jumped out, came around the car, and tried to kick Myers between the legs. However, Smith missed and hit Myers' left thigh. Myers was sure Smith said something as he tried to kick him, but he did not recall what he said. Myers was certain it did not have anything to do with Amanda and Myers. Myers did not

swing at Smith because he [Myers] had a big bandage on his hand—a big splint on the ring finger of his right hand. Myers had been in a motorcycle accident a month before and that hindered his ability to use his right hand. He had cut the end of his finger off. Tr. 2325-2327, 2428.

{¶ 266} According to Myers, when they got inside the Roundtable, they mingled and went their separate ways. He spoke to Smith, but there were no arguments. Myers went outside with Brenda and was not inside the bar when Smith broke a glass and was acting belligerent, nor was Myers inside when the bartender called the police. Rather, he heard about it from the people at the bar. Myers saw Smith and Amanda come outside, arguing and heading toward their car. When the police arrived, Myers went inside the bar, got another drink, and watched the police arrest Smith. The police also came inside the bar. While Myers was not supposed to be in bars because he was on probation, he did not run away behind the bar. He was in a front booth inside the bar and could see what was happening. When the police put Smith in the cruiser, Myers saw Amanda crying and went outside. Tr. 2333, 2336-2342.

{¶ 267} Myers stated that he never saw the police give Smith's wallet to Amanda. He did not know if Amanda had Smith's wallet at all on the night of August 4. While Myers was talking with Amanda, a police officer approached them and asked how Amanda was going to get home. Myers told the officer that his car was parked across town, and he would see that she got home. Amanda agreed but wanted to look for the keys. Myers went inside and asked the bartender for a flashlight. He got one, went back outside, and looked for the keys for ten minutes. Myers suggested they go ahead and get his car. Amanda was crying hard at this time and said no, she was not going anywhere with him; if it had not been for him, Smith would not have gotten drunk and been arrested. At that point, Myers said, "see you,"

104

left, and got his car. When he left, Amanda was outside in the parking lot with the flashlight, looking for the keys. Tr. 2344-2345, 2347-2348.

{¶ 268} Myers walked to Five Points. His route was to go up Home Avenue to Detroit Street and then to Third Street, and there was a little street that ran right behind the bar. He did not go in Five Points but drove back to the Roundtable to see if Amanda had changed her mind and wanted a ride home, but she was not there. Myers got back to Roundtable at around 2:10-2:15 a.m. and asked the bartender if she had seen Amanda; she said no. Myers told the bartender what had happened. He said that he was going to give Amanda a ride, and she blamed him for Smith being drunk and had called the bartender a "bitch" for calling the police. Tr. 2348, 2351, 2354-2355.

{¶ 269} Myers also talked to Don H. and went to Don's house at 2:30 a.m. He stayed for about an hour. Myers then went to his mother's house. He stated that he did not have to work the next day, as they worked 10 hours on Monday through Thursday, and had Fridays, Saturdays, and Sundays off. Tr. 2358-2359. The murder happened during the early morning hours of Thursday, August 4. By Myers' account, that means he would have been scheduled to work that day. However, he did not go to work.

{¶ 270} According to Myers, when he returned to the Roundtable for the last time, he was there for 15 minutes. When he left the Roundtable after last call to go to Don's house, he noticed two separate wallets on the front seat of his car. He had no idea how the wallets got there. He did not see them when he picked his car up at Five Points. He went through the wallets and saw some papers, but there was no driver's license or other identification in either wallet. He went through the wallets to see if there was any money in them and found $4.00. Myers believed he probably put the wallets under the seat in his car and may have wrapped them in something. Tr. 2362-2365, 2423.

105

{¶ 271} Having considered Myers' statements, before and after his arrest, we turn to the remaining evidence. We already discussed above the testimony of defense witnesses in evaluating the perceived connection between the new DNA evidence and the credibility of the defense's trial witnesses. Not all of the remaining evidence is strictly relevant to the merits of new trial motion, but we have reviewed and considered it all.

### h. Other Witnesses

### i. Deputy Thomas Adkins

{¶ 272} Adkins worked at the Greene County Jail and processed Myers when he was arrested on August 4. Adkins knew Myers from a prior occasion when Myers had been confined in the jail for a few months, and he and Myers were on a first-name basis. The booking process took about 30 minutes. Adkins filled out the actual book-in card and took Myers' photo. During this process, Adkins had a conversation with Myers, during which Myers indicated he was using cocaine. Myers said, "Tom, man, cocaine will make you do anything. You will do anything to get it." Adkins made no response to that. Tr. 1292, 1294-1296, 1299.

### ii. David Tincher

{¶ 273} As noted, Myers made incriminating statements to Tincher in August 1988 while they were both in the same cell block. Tincher informed Officer Kesselkamper, who worked in the jail, about Myers' comments, which concerned Tincher and made him uncomfortable. Kesselkamper contacted his supervisor, who said he would inform the investigators. Tincher was transferred to another cellblock, and Detective Green interviewed him on August 19, 1988. Green recorded the interview. Tr. 1176-1178, 1455, 1457-1459.

### iii. Mark T.

**{¶ 274}** Mark was confined in the Greene County Jail for six months in July 1989 and was in the same area as Myers for about a month. Mark was later transferred to Madison Correctional Institution to serve a six-year felony sentence. While in the Greene County Jail, Mark overheard Myers discussing this case with another person on two occasions, during which Myers discussed his activity or exactly what he thought had transpired. Myers mentioned specifically that he had been in that particular bar, that he had left the bar with the woman in question, and that had gone up to the railroad tracks with her. Myers' story diverged in each retelling. In the first conversation, Myers said he went up to the tracks with the woman, that they had a conversation for a while, and that he left her up there. Myers said he took a walk, and that was basically it. Myers used the words railroad tracks. Mark had no idea what railroad tracks Myers was talking about, as he was from Cedarville, not Xenia. Tr. 926, 929-930.

**{¶ 275}** The second conversation was basically the same up to the point where Myers discussed the railroad tracks. This time, Myers mentioned he had a disagreement and left. Instead of saying he went for a walk, Myers claimed first that he went back to his car and then, right in the middle of the conversation, changed his account to say that he went for a walk. Tr. 930.

### iv. Robert Setzer

**{¶ 276}** Setzer was the BCI agent who collected most of the evidence in this matter. Much of his testimony details facts about the evidence collected and processed in the case. Of note, when Setzer examined Myers' automobile on August 4, under the front passenger seat he discovered a brown cotton glove containing two wallets. One of the wallets contained Amanda's identification, and the other wallet contained Glenn Smith's identification. The

contents of the wallets were inventoried. The lighter brown wallet found inside the glove contained a social security number with Amanda's name on it, two of Smith's phone cards, a baby picture, some of Amanda's high school records, one of Smith's check stubs, Amanda's birth certificate, a personal check from someone Amanda babysat for, a library card from Greene County, and a business card from a realtor company where Amanda's mother was working. Tr. 720-721, 1128-1131, 1500-1502.

{¶ 277} Glenn Smith identified both wallets at trial. The second wallet belonged to him. This wallet contained a cutout picture of Smith's first wife, a picture of his previous girlfriend, a certificate from the car insurance he had in Florida, another of his check stubs, a movie card, pictures of his daughter, Smith's social security card, another business card, a medical certificate, and his birth certificate. This was the wallet that was in Smith's possession when he was arrested (but was subsequently given to Amanda by the arresting officer, Savage), and the other wallet was Amanda's on August 3-4. Tr. 722-723.

v. D.R.

{¶ 278} The State also presented testimony from D.R., who testified that Myers had raped her orally and vaginally in February 1986. Tr. 2343, 2452. On Myers' direct appeal, we found that this evidence had been improperly admitted but that it was harmless error because of the overwhelming evidence of guilt. *Myers I*, 1999 WL 94917 at *7. The Supreme Court of Ohio instead concluded that the evidence was properly admitted, as it "related to Myers's identity in that it established a modus operandi on the part of Myers." *Myers II*, 2002-Ohio-6658, at ¶ 104. In this vein, the Supreme Court of Ohio stated:

The acts leading up to [D.R.'s] rape and Maher's murder were very similar. Both times, Myers went to a Xenia bar where he saw a young woman and her male companion get into an argument. In both instances, after the male

108

companion left the woman at the bar alone, Myers assured the woman that everything would be fine and offered to give her a ride home. In each instance, Myers left the bar alone with the young woman, took her to a secluded area where he used a weapon, and sexually assaulted the victim. The difference in the sexual assaults was that Maher apparently resisted, which resulted in her murder.

*Myers II* at ¶ 105.

{¶ 279} This is a correct summation of D.R.'s testimony. *See* Tr. 2443-2453. The circumstances of the crimes are strikingly similar. The Supreme Court of Ohio also noted that "Myers later entered an Alford plea to sexual battery, was found guilty, and was sentenced to six months in jail and five years' probation." *Myers II* at ¶ 22. Like most of the evidence presented at trial, the trial court failed to consider this testimony in ruling on the new trial motion, and Myers has failed to address it.

{¶ 280} The remaining trial testimony involved Dr. Krause, the coroner (who discussed the cause of death); experts who estimated the time of death (Dr. Badin and Dr. Norrgram), placing it within the time after Amanda and Myers were last seen and when Myers was seen getting into his car at Five Points; experts who analyzed the foreign pubic hair (Michelle Yezzo, BCI microscopic hair analyst; Dehus; Dr. Bisbing; and Dr. Blake, who conducted DNA testing); and the testimony of medical personnel who treated Amanda at the scene and at the hospital.

### 3. Final Analysis Under *Petro*

{¶ 281} The experts who examined the foreign pubic hair had nothing to do with the DNA analysis of the rocks or the spike. Myers' exclusion as the DNA contributor to those items does not mean that he was not present at the crime scene and did not commit the

crime. As to this point, the trial court discussed evidence about two cigarette butts that the State had recently submitted for DNA analysis. New Trial Judgment, p. 2. The Salem cigarette butt was consistent with Amanda's DNA; the DNA on the Marlboro cigarette butt excluded Myers. *See* New Trial Tr. 840-841 and Ex. 106; *see also* Judgment Entry – Manually Entering DNA Profile into CODIS (July 29, 2024) (ordering that sample 8r.1, from a Marlboro cigarette, be manually entered into CODIS). As noted, this was not done until after the new trial hearing.

{¶ 282} Myers' exclusion as the contributor to the DNA on the cigarette butt recovered at the crime scene does not mean he was not present there. There was no evidence or testimony that Myers was smoking that night, and a search of his car ashtray did not reveal any Salem or Marlboro cigarette butts. Tr. 1553, 1558. Many people used the shortcut through the railroad yard. The Marlboro cigarette butt could have been discarded there at any point before the murder. Moreover, neither "alternate suspect" was implicated by having their DNA on the Marlboro butt. Trial testimony also reveals that the more likely suspect advocated by Myers (Grimes) smoked Doral menthol cigarettes. Tr. 2735, 2787. Consequently, we attach little significance to the cigarette butts.

{¶ 283} Having reviewed the trial evidence and compared it to the testimony and evidence at the hearing on the motion for new trial, we conclude that the trial court's decision to grant the new trial was not based on sound reasoning. Beyond the defects we have already discussed, the evidence at trial was overwhelming. Even if we set aside the evidence from the hair and the DNA analysts, as the trial court incorrectly did, the remaining evidence supports the conclusion of Myers' guilt. A strong probability does not exist that the newly discovered DNA evidence would result in a different outcome.

{¶ 284} As an initial point, although Myers places great emphasis on his "exclusion," the fact is that his alternate suspects were not implicated in any way by the new DNA results. The status quo remained, with no proof other than what had been presented at trial that failed to indicate those persons were involved in the murder. More importantly, Myers' guilt was, and is, overwhelming. His own accounts contradicted each other and were contradicted by other witnesses. As is evident from the testimony cited above, Myers claimed Amanda was not in his car, but later admitted she was. He also said he did not leave the Roundtable with Amanda when other witnesses said he did. Even his accounts of what happened when he left varied. At times he claimed Amanda was in the parking lot on her hands and knees looking for keys when she got mad and he left her there; at other times, he claimed that when he left the Roundtable, Amanda was not even in the parking lot.

{¶ 285} Myers claimed in his interview with Detective Green that he left Don's house on August 4 because he had to get up early to go to work; in his deposition, Myers said he did not have to work that day. As a reason why he did not hit Glenn Smith when Smith tried to kick him between his legs, Myers said it was because he had been injured and had a big ball bandage on his hand. This could also have been to show why he could not have been able to strangle Amanda. However, a witness said she did not see a bandage on any of Myers' fingers before the murder. Likewise, none of the police officers saw a bandage on Myers' hand, and Green had no difficulty taking Myers' fingerprints on August 4. Myers was also able to engage in construction work for ten hours on August 3, which again is inconsistent with his alleged inability to use his hand. Tr. 1118, 1122-1123, 1146, 1209, 1438, 2299, 2327, 2358-2359.

{¶ 286} Furthermore, accepting Myers' account about the wallets requires the willing suspension of disbelief. His explanation of how the wallets came to be in his car was

111

preposterous. Somehow, Myers apparently did not see the wallets sitting on his front seat when he picked up his car at Five Points. Assuming they were not on the front seat until 15 minutes later when he left the Round Table at 2:30 a.m., it defies belief that somehow, someone—presumably the "real" murderer who stole the wallets—happened to come to the Roundtable parking lot, choose Myers' car, and throw the wallets on the front seat. Also unbelievable is Myers' testimony that he looked inside the wallets but did not see any identification. When the police recovered the wallets from Myers' car, they found a considerable number of items with identifying information.

{¶ 287} In arguing that the court correctly granted a new trial, Myers contends that the jailhouse informants' testimony carries little weight. However, such informants may not be discredited simply because they are in jail, particularly when their testimony is corroborated by other evidence. *E.g., State v. McKelton*, 2016-Ohio-5735, ¶ 329. Juries are free to believe or disbelieve the testimony of jailhouse informants. *State v. McClendon*, 2011-Ohio-6235, ¶ 24 (10th Dist.). Here, the jury chose to believe them.

{¶ 288} The testimony of many witnesses contradicted Myers' account. No motive was shown for these witnesses to have lied. For example, when Myers came back to the Roundtable, he told Teresa that when he left with Amanda and they were walking, Amanda started acting crazy, told him he had set up her boyfriend, and took off running. This contradicts Myers' story that he did not see Amanda when he left the Roundtable or that she was in the parking lot on her hands and knees. Furthermore, at that time, Myers made the statement to Don about trying to "get something" but Amanda was not willing, so he dropped her off. Tr. 809, 963. None of these witnesses were shown to have had a motive to lie.

{¶ 289} Based on the foregoing, the evidence presented at the new trial hearing did not support granting the motion for new trial. The State's second assignment of error is

112

sustained. The trial court's judgment on the motion for new trial is reversed, and this matter is remanded with an instruction to enter judgment overruling the motion for new trial. *See State v. Gaines*, 2011-Ohio-6719, ¶ 42-43 (1st Dist.) (concluding that evidence presented at new trial hearing did not support granting motion, reversing trial court's judgment granting new trial, and remanding with instruction to enter judgment overruling the motion for new trial). Our next task is to consider the trial court's decision granting Myers' Relief Petition. For purposes of simplicity, we consider the State's third, fourth, and fifth assignments of error together.

### IV. Errors Concerning Trial Court's Jurisdiction Over Relief Petition

**{¶ 290}** The State's third assignment of error states:

The trial court held a hearing on the merits of Defendant's successive and untimely Petition before determining that it had jurisdiction to consider it.

**{¶ 291}** The State's fourth assignment of error is as follows:

The trial court did not have jurisdiction to consider Defendant's successive and untimely Petition.

**{¶ 292}** Finally, the State's fifth assignment of error contends:

The trial court abused its discretion in granting Defendant a hearing on his Petition.

**{¶ 293}** Under these assignments of error, the State contends the trial court erred in holding a hearing on the Relief Petition before deciding jurisdiction because a trial court must consider jurisdiction first before holding a hearing. The State further argues the evidence failed to support the court's decision that Myers was "unavoidably prevented from discovering the new DNA evidence and the "other forensic evidence." The State notes the court failed to find that Myers suffered constitutional error at trial before considering the

113

petition's merits. The State also maintains that the trial court's finding that Myers suffered constitutional error at trial contradicts controlling law. And finally, in the fifth assignment of error, the State makes essentially the same arguments. Before discussing these points, we discuss the law generally applicable to postconviction petitions and the standards for reviewing the questions the State has raised.

A. Postconviction Petition Principles and Standards of Review

**{¶ 294}** There is no dispute that Myers' petition for postconviction relief was both untimely and successive. In that situation, R.C. 2953.23 provides:

(A) Whether a hearing is or is not held on a petition filed pursuant to section 2953.21 of the Revised Code, a court may not entertain a petition filed after the expiration of the period prescribed in division (A) of that section or a second petition or successive petitions for similar relief on behalf of a petitioner unless division (A)(1) or (2) of this section applies:

(1) Both of the following apply:

(a) Either the petitioner shows that the petitioner was unavoidably prevented from discovery of the facts upon which the petitioner must rely to present the claim for relief, or, subsequent to the period prescribed in division (A)(2) of section 2953.21 of the Revised Code or to the filing of an earlier petition, the United States Supreme Court recognized a new federal or state right that applies retroactively to persons in the petitioner's situation, and the petition asserts a claim based on that right.

(b) The petitioner shows by clear and convincing evidence that, but for constitutional error at trial, no reasonable factfinder would have found the petitioner guilty of the offense of which the petitioner was convicted or, if the

114

claim challenges a sentence of death that, but for constitutional error at the sentencing hearing, no reasonable factfinder would have found the petitioner eligible for the death sentence.

(2) The petitioner was convicted of a felony, the petitioner is an offender for whom DNA testing was performed under sections 2953.71 to 2953.81 of the Revised Code or under former section 2953.82 of the Revised Code and analyzed in the context of and upon consideration of all available admissible evidence related to the inmate's case as described in division (D) of section 2953.74 of the Revised Code, and the results of the DNA testing establish, by clear and convincing evidence, actual innocence of that felony offense or, if the person was sentenced to death, establish, by clear and convincing evidence, actual innocence of the aggravating circumstance or circumstances the person was found guilty of committing and that is or are the basis of that sentence of death.

{¶ 295} Postconviction proceedings are civil collateral attacks on criminal judgments, and the right is statutory, not constitutional, and limited to only what the statute grants. *State v. Apanovitch*, 2018-Ohio-4744, ¶ 35, citing *State v. Calhoun*, 86 Ohio St.3d 279, 281 (1999), and *State v. Broom*, 2016-Ohio-1028, ¶ 28. Failure to satisfy the requirements is jurisdictional and precludes a court from hearing the matter. *Id*. at ¶ 36-38. Whether the common pleas court had jurisdiction to entertain the petition is a legal question, which is reviewed de novo. *Id*. at ¶ 24, citing *State v. Kane*, 2017-Ohio-7838, ¶ 9 (10th Dist.). De novo review means our review is independent, without deference to the trial court's decision. *State v. Wolfe*, 2022-Ohio-215, ¶ 12 (2d Dist.), citing *Northeast Ohio Apt. Assn. v. Cuyahoga Cty. Bd. of Commrs.*, 121 Ohio App.3d 188, 192 (8th Dist. 1997).

B. Discussion

**{¶ 296}** Under *Apanovitch,* Myers is clearly precluded from seeking relief under R.C. 2953.23(A)(2) because he did not request DNA testing under the Ohio statutes that allow for such testing. This, in fact, is one of the reasons why the Supreme Court of Ohio held that Apanovitch's postconviction petition could not be heard. *Apanovich* at ¶ 27-41.

**{¶ 297}** Myers has not claimed that the United States Supreme Court has established a new federal or state right that applies retroactively, so the remaining potential jurisdictional basis is R.C. 2953.23(A)(1), which requires a petitioner to establish that "the petitioner was unavoidably prevented from discovery of the facts upon which the petitioner must rely to present the claim for relief" and to show "by clear and convincing evidence that, but for constitutional error at trial, no reasonable factfinder would have found the petitioner guilty of the offense of which the petitioner was convicted." R.C. 2953.23(A)(1)(a) and (b).

**{¶ 298}** To meet the standard of "being unavoidably prevented," "courts in Ohio have previously held that a defendant ordinarily must show that he was unaware of the evidence he is relying on and that he could not have discovered the evidence by exercising reasonable diligence." *Bethel*, 2022-Ohio-783, at ¶ 21. The "'unavoidably prevented' requirement in Crim.R. 33(B) mirrors the 'unavoidably prevented' requirement in R.C. 2953.23(A)(1)." *Id*. at ¶ 59, quoting *Barnes*, 2018-Ohio-1585, at ¶ 28 (5th Dist.).

**{¶ 299}** In its decision on the Relief Petition, the trial court found, as it had with the new trial motion, that Myers was unavoidably prevented from discovering the new DNA evidence that was presented. Relief Petition Judgment (Aug. 6, 2024), p. 5. The court noted that academic studies done after trial "regarding the lack of objectivity of expert opinions had undermined the reliability of testimony (1) establishing the time of injury based on gastric emptying, (2) matching hair samples to establish identity, and (3) interpreting strangulation

116

marks to establish identity." *Id*. The court did not make a finding at that point on what constitutional right had been violated, although it later found Myers had been deprived of a fair trial and referred to substantive due process. *Id*. at p. 18-21.

{¶ 300} The State is correct concerning a trial court's duties in considering postconviction petitions. R.C. 2953.21(A)(1)(a) provides:

A person in any of the following categories may file a petition in the court that imposed sentence, stating the grounds for relief relied upon, and asking the court to vacate or set aside the judgment or sentence or to grant other appropriate relief:

(i) Any person who has been convicted of a criminal offense or adjudicated a delinquent child and who claims that there was such a denial or infringement of the person's rights as to render the judgment void or voidable under the Ohio Constitution or the Constitution of the United States;

(ii) Any person who has been convicted of a criminal offense and sentenced to death and who claims that there was a denial or infringement of the person's rights under either of those Constitutions that creates a reasonable probability of an altered verdict.

{¶ 301} R.C. 2953.21(D) further provides: "Before granting a hearing on a petition filed under division (A)(1)(a)(i), (ii), (iii), or (iv) of this section, the court shall determine whether there are substantive grounds for relief. In making such a determination, the court shall consider, in addition to the petition, the supporting affidavits, and the documentary evidence, all the files and records pertaining to the proceedings against the petitioner, including, but not limited to, the indictment, the court's journal entries, the journalized records of the clerk of the court, and the court reporter's transcript."

**{¶ 302}** "A petitioner who challenges his conviction by seeking post-conviction relief is not automatically entitled to a hearing." *State v. Mott*, 2022-Ohio-2894, ¶ 11 (2d Dist.), citing *Calhoun*, 86 Ohio St.3d at 282. "Instead, 'a trial court has a gatekeeping role as to whether a defendant will even receive a hearing.'" *Id.*, quoting *State v. Gondor*, 2006-Ohio-6679, ¶ 51. "Before granting an evidentiary hearing on a petition, a trial court shall determine whether there are substantive grounds for relief." *Id.*, citing *State v. Perry*, 2016-Ohio-4582, ¶ 24 (2d Dist.).

**{¶ 303}** In responding to the State's third, fourth, and fifth assignments of error, Myers has not disputed that the trial court failed to exercise its gatekeeping function. Rather, Myers argues: (1) the court properly found he was unavoidably prevented from filing his petition; (2) even if the "other forensic evidence" was not new, the DNA evidence was undisputably new; (3) Myers properly asserted constitutional claims in his petition beyond actual innocence by in effect asserting the point the trial court made, i.e., that his trial was fundamentally unfair; (4) the court did not have to determine that it had jurisdiction because Myers pled appropriate facts in his petition, the court could rely on what it heard at the hearing, and we can decide the issue de novo; (5) the "new developments in forensic evidence since the trial nullified nearly every piece of evidence the State introduced against Mr. Myers"; and (6) while the court did not discuss this point, trial counsel rendered ineffective assistance of counsel, which was a cognizable claim and was not subject to res judicata. Myers' Brief, p. 61-81. Myers also asserts that Ohio's postconviction statutes are unconstitutional, that there is no formal requirement that jurisdiction be established before holding a hearing, and that even if the court erred in holding a hearing, it remedied this by concluding in its decision that it had jurisdiction. *Id.* at p. 81-84.

{¶ 304} As to the last point, the trial court's decision mentioned various postconviction principles; the court even stated that a petitioner is not entitled to an evidentiary hearing and that the court must first determine if there are substantive grounds for relief. Relief Petition Judgment, p. 3-4, citing R.C. 2953.21(C) (the incorrect subsection of the statute). However, the court failed to mention that this is a gate-keeping function that must be performed before allowing an evidentiary hearing. The court also failed to even mention jurisdiction. Instead, it simply decided that due to the "new DNA evidence" it had considered in connection with the new trial motion and the academic studies and so forth, Myers had been unavoidably prevented from discovering the facts in support of his petition, and it was "deemed timely." *Id*. at p. 5. We agree with the State that the trial court erred in failing to comply with the statutory requirements.

{¶ 305} In the context of postconviction petitions, the Supreme Court of Ohio has said that jurisdictional issues cannot be waived, nor can the court ignore them. *Apanovitch*, 2018-Ohio-4744, at ¶ 37-40. We cannot go back and with hindsight decide that a trial court had jurisdiction over an issue that the court failed to properly consider at the time it was required to do so. We agree with the State that a separate showing and analysis was required and the trial court was not permitted to simply rely on the testimony from the evidentiary hearing to decide if it had jurisdiction to decide the case. *See* State's Brief, p. 99.

{¶ 306} R.C. 2953.21(D) specifically states: "*Before granting a hearing* on a petition filed under division (A)(1)(a)(i), (ii), (iii), or (iv) of this section, *the court shall determine whether there are substantive grounds for relief*." (Emphasis added.) "In statutory construction, the word 'may' shall be construed as permissive and the word 'shall' shall be construed as mandatory unless there appears a clear and unequivocal legislative intent that they receive a construction other than their ordinary usage." *Dorrian v. Scioto Conservancy*

119

*Dist.*, 27 Ohio St.2d 102 (1971), paragraph one of the syllabus. No such intent is evident in the statute.

{¶ 307} In discussing "R.C. 2953.21, Ohio's Post–Conviction Remedy Act," which was passed in 1965, the Supreme Court of Ohio stressed that "[p]ostconviction relief is a remedy sought by a defendant who has either been tried and found guilty beyond a reasonable doubt, or who has pled guilty and has been convicted. In the interest of judicial economy and efficiency, we have held that it is not unreasonable to require the defendant to show in his petition for postconviction relief that such errors resulted in prejudice *before* a hearing is scheduled." (Emphasis added.) *Calhoun*, 86 Ohio St.3d at 283, citing *State v. Jackson*, 64 Ohio St.2d 107, 112 (1980). Nothing has changed in this respect since R.C. 2953.21 was enacted. The statute has never been amended to alter the mandatory requirement of "shall" to "may." Trial courts have no discretion in this matter.

{¶ 308} Furthermore, even under an abuse of discretion standard, "a court does not have discretion to misapply the law." *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 38. Therefore, the trial court erred in failing to follow the procedure required by R.C. 2953.21(D).

{¶ 309} Good reason exists for requiring a preliminary analysis. For example, the State argues in its brief that Myers' Relief Petition failed to present cognizable constitutional claims as required under R.C. 2953.23(A)(1). *See* State's Brief, p. 100. The State lists all the grounds for relief that Myers asserted and discusses why these claims are not constitutional claims. *Id*. at p. 100-113. Regarding Myers' first, second, fifth, and sixth claims, the State asserts they were based on Myers' claim of actual innocence, which is not a constitutional claim. *Id*. at p. 101, citing *Apanovitch*, 2018-Ohio-4744, at ¶ 26. In *Apanovitch*, the Supreme Court of Ohio found the defendant's claim that he was innocent of a rape charge did not qualify as a constitutional claim under R.C. 2953.23(A)(1)(b). The reason was

120

that "[t]he United States Supreme Court has ruled that under the United States Constitution, an actual-innocence claim 'is not itself a constitutional claim.'" *Apanovitch* at ¶ 26, quoting *Herrera v. Collins*, 506 U.S. 390, 404 (1993). *Accord State v. Dixon*, 2021-Ohio-225, ¶ 11 (2d Dist.).

{¶ 310} In responding to the State's brief, Myers acknowledges that actual innocence is not a constitutional claim. However, Myers claims his case is "unique" because "constitutional error led to the conviction of an innocent man" due to unreliable trial evidence. Myers' Brief, p. 69-70. The State contends this is "a distinction without a difference." State Reply Brief, p. 29. We agree. Nonetheless, the trial court never specifically addressed whether the petition asserted appropriate constitutional claims. Instead, in its hindsight decision, the court found, as noted, that Myers had been deprived of a fair trial and referred to substantive due process, which has been defined as "shocking the conscience." Relief Petition Judgment, p. 17-21. Although Myers did assert due process in his postconviction petition, that does not impact the court's failure to follow statutory procedures.

{¶ 311} The trial court also applied an incorrect standard for assessing postconviction petitions. Despite citing the correct standard, which is that "but for constitutional error at trial, no reasonable factfinder would have found the petitioner guilty of the offense of which the petitioner was convicted," the court instead found that "due to the constitutional errors described above, there is a reasonable probability that a different verdict would occur had the errors not permeated the trial." Relief Petition Judgment, p. 5, 21.

{¶ 312} In addition, we have already found with respect to the new trial motion that there is not a strong probability of a different outcome if the new DNA evidence were considered. Given this conclusion, it is hard to conceive that "no reasonable factfinder" would find Myers guilty. This is a much more difficult standard to meet.

121

{¶ 313} The court also incorrectly based its decision on "whether the new evidence – and without the formerly admitted but now unreliable evidence – has a strong probability of changing the outcome." Relief Petition Judgment, p. 19. As we noted, this is not the standard for assessing the evidence. A court must consider all the evidence, not randomly decide that certain evidence will or will not be admitted at a future trial.

{¶ 314} Based on the preceding discussion and under the correct legal standards, the record before the trial court did not establish that Myers had demonstrated substantive grounds for postconviction relief. The State's third, fourth, and fifth assignments of error are sustained. The trial court's judgment granting the petition for postconviction relief is reversed, and this matter is remanded with an instruction to enter judgment denying the petition.

V. Abuse of Discretion in Granting Petition for Postconviction Relief

{¶ 315} The State's sixth and final assignment of error states:

The trial court abused its discretion in granting Defendant's Petition.

{¶ 316} Under this assignment of error, the State contends that even if the court had not erred in granting Myers a hearing without deciding if it had jurisdiction, had jurisdiction to consider the motion, and had not abused its direction in holding a hearing, the trial court nonetheless abused its discretion by granting Myers' petition. According to the State, this is because the only ground the court relied on was based on Myers' claim of actual innocence, which is not a cognizable constitutional claim. Rather than considering Myers' claim of actual innocence, the court dismissed the rest of Myers' postconviction claims as moot. State's Brief, p. 115, citing Relief Petition Judgment. This is correct. *See* Relief Petition Judgment, p. 21 (dismissing Myers' claims other than the due process claim as "moot.") Nonetheless,

122

we need not consider this issue because we have already decided that the court fatally erred by failing to follow the required statutory procedure.

{¶ 317} In view of our prior discussion, this assignment of error is overruled as moot.

## VI. Conclusion

{¶ 318} The State's first assignment of error having been overruled, the second, third, fourth, and fifth assignments of error having been sustained, and the sixth assignment of error having been overruled as moot, the judgments of the trial court on Myers' motion for a new trial and petition for postconviction relief are reversed. The judgment on the motion for leave to file a motion for new trial is affirmed. This matter is remanded to the trial court with instructions to enter judgments overruling the motion for new trial and denying the petition for postconviction relief.

. . . . . . . . . . . . .

TUCKER, J., and EPLEY, J., concur.